## JOHNSON v. BROWNE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 481. Argued March 4, 5, 1907.—Decided April 8, 1907.

Although the surrender of a person demanded under an extradition treaty has been made, it is the duty of the courts here to determine the legality of the subsequent imprisonment which depends upon the treaties in force between this and the surrendering governments.

While the treaty of 1842, with Great Britain, had no express limitation of the right of the demanding country to try a person only for the crime for which he was extradited, such a limitation is found in the manifest scope and object of the treaty itself and it has been so construed by this court. *United States* v. *Rauscher*, 119 U. S. 407.

A person extradited under the treaty of 1899 with Great Britain cannot be punished for an offense other than that for which his extradition has been demanded even though prior to his extradition he had been convicted and sentenced therefor.

Sections 5272, 5275, Revised Statutes, clearly manifest the intention and the will of the political department of the Government, that a person extradited shall be tried only for the crime charged in the warrant of extradition, and shall be allowed a reasonable time to depart out of the United States before he can be arrested and detained for any other offense.

Repeals by implication are never favored, and a later treaty will not be regarded as repealing, by implication, an earlier statute unless the two are so absolutely incompatible that the statute cannot be enforced without antagonizing the treaty, and so *held* that the treaty with Great Britain of 1899 did not repeal §§ 5272, 5275, Rev. Stat.

While the escape of criminals is to be deprecated, treaties of extradition should be construed in accordance with the highest good faith, and a treaty should not be so construed as to obtain the extradition of a person for one offense and punish him for another, especially when the latter offense is one for which the surrendering government has refused to surrender him on the ground that it was not covered by the treaty.

THE respondent sued out a writ of *habeas corpus* from the Circuit Court of the United States for the Southern District of New York, directed to the agent and warden of the state prison at Sing Sing, in the State of New York, where he was confined, and pursuant to the terms of the writ the respondent was brought before that court in New York city, and after a hearing the court ordered his discharge. The agent and warden has appealed to this court from that order.

The facts appearing on the hearing before the Circuit Court on the return to the writ were these:

The respondent was an examiner of silks in the appraisers' department in the port of New York, and in the spring of 1903, in the Circuit Court of the United States for the Southern District of New York, a grand jury found two indictments against him, one being found against him jointly with two others for conspiring to defraud the United States in violation

of section 5440 of the Revised Statutes; and the other was against him alone for knowingly attempting to enter certain Japanese silks upon payment of less than the amount of legal duty thereon, in violation of section 5444, Revised Statutes.

In January, 1904, he, in company with one of the others named in the indictment (the other having fled the jurisdiction), was tried in the Circuit Court of the United States for the Southern District of New York upon the indictment charging them with conspiracy. He was convicted and sentenced to imprisonment in the state prison at Sing Sing, N. Y., for two years.

He appealed to the Circuit Court of Appeals for the Second Circuit, where the conviction was affirmed, and thereafter an application was made in his behalf to this court for a certiorari to review the judgment of conviction, which application was denied in January, 1906.

After his trial and conviction, and pending a review of the judgment, the respondent had been enlarged on bail, and after the judgment was affirmed in the Circuit Court of Appeals and a certiorari from this court had been denied, he was, on the nineteenth of January, 1906, duly called in the Circuit Court to submit himself to sentence, but did not appear, and his default was entered.

A few days subsequently he was found in the Dominion of Canada. This Government then instituted extradition proceedings in Montreal to procure his rendition upon the judgment of conviction of conspiracy to defraud the United States, and claimed it was an extraditable crime under the fourth subdivision of article I of the treaty or "extradition convention" of 1889, between the United States and Great Britain. That subdivision reads as follows:

"4. Fraud by a bailee, banker, agent, factor, trustee or director or member or officer of any company made criminal by the laws of both countries."

The respondent was held for extradition by the Canadian

commissioner, but, on writ of *habeas corpus*, the Court of King's Bench held that the conspiracy to defraud the United States, as set forth in the indictment upon which respondent was convicted, was not such a fraud as was provided for in the subdivision of the article of the treaty above referred to. Extradition was therefore refused.

Thereupon the United States secured the rearrest of the respondent on another complaint, charging him with the offenses for which he had been indicted under section 5444 of the Revised Statutes, and for which he had not been tried in New York. The Canadian commissioner held the respondent upon that complaint, and ordered his extradition, and, upon a writ of *habeas corpus*, the Court of King's Bench affirmed that order; and the respondent was then surrendered to the proper agent of the United States, who at once took him to the State of New York, and, having arrived within the Southern District of that State, the marshal of that district, proceeding under the warrant for imprisonment issued by the Circuit Court upon the conviction of the respondent on the conspiracy indictment, took possession of him and delivered him into the custody of the warden of Sing Sing Prison, there to be imprisoned for two years according to the sentence imposed upon him under the conviction as stated.

The respondent then obtained this writ upon a petition setting forth the above facts, and claimed that his imprisonment was in violation of the third and seventh articles of the extradition treaty between the United States and Great Britain. 26 Stat. 1508. The warden of the prison made return August 7, 1906, that he held the respondent by virtue of the final judgment of the Circuit Court of the United States for the Southern District of New York, rendered on the ninth of March, 1904, as above set forth.

*Mr. W. Wickham Smith,* with whom *The Solicitor General* was on the brief, for appellant:

There is nothing in either article III or article VII of the

Blaine-Pauncefote Treaty of July 12, 1889, which protects the respondent from imprisonment under a sentence imposed before his flight.

It is entirely clear that the sole purpose of paragraph 1 of article VII was to prevent any claim being interposed on behalf of a fugitive convict that the provisions of the treaties of 1842 and 1889 applied only to untried criminals, and not to those who had been tried and convicted.

The language of article III is plain, unambiguous and unequivocal. It leaves no room for construction. Neither in a contract nor in a statute could these words be stretched so as to include punishment. The word "tried" has a plain meaning, everywhere understood, and as to which there can be no mistake or confusion. It certainly does not imply or include punishment. Until a party has been tried it cannot be determined whether he is to suffer any punishment. He may be acquitted, or after conviction sentence may be suspended, or he may be immediately pardoned, in none of which cases would he suffer any punishment. The object of inserting the word "triable" is obviously to protect the person extradited from being arrested and kept in custody or held in bail awaiting trial. It was obviously intended to give the party extradited a right to raise the question of the illegality of his arrest without having to wait until the prosecuting officer got ready to try him, and compel him to put in his plea for the first time at the beginning of the trial.

The necessity and propriety of adhering to the plain language of treaties has been fully recognized by this court. *The Amiable Isabella,* 6 Wheat. 1, 71; *Society &c.* v. *New Haven,* 8 Wheat. 464, 490; *Tucker* v. *Alexandroff,* 183 U. S. 424, 436.

The language of article III of the treaty of 1889, considered in connection with that of article II of the same treaty, repels any inference that it was the true intent and meaning of article III to forbid the punishment of any person extradited under the terms of the treaty for an offense of which he had

been convicted and upon which he had been sentenced before his flight.

In this article there is added to the words "triable or tried" found in the third article the words "or be punished." If these words were found in article III this case would never have arisen.

That the intention of the parties to a treaty must be ascertained by an examination of the entire instrument was held by this court in *United States* v. *Texas*, 162 U. S. 1.

The same principle has been repeatedly applied by this court to statutes. *Silver* v. *Ladd*, 7 Wall. 219, 227; *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S. 1, 22; *Missouri, Kansas & Texas Railway* v. *Haber*, 169 U. S. 613, 635.

The language of article III of the treaty when compared with that of provisions in other treaties of the United States, adopted both prior and subsequent to that of the treaty in question, plainly shows that the construction contended for by the respondent is untenable. *In re Joseph Stupp*, 11 Blatchf. 124.

The fact that an application had been made by the United States to the Canadian Government for the extradition of respondent on a charge upon which he had been convicted and sentenced, and that said application had been refused, does not in any way destroy the right of the Circuit Court of the United States to enforce the execution of its sentence after the extradition of respondent on another charge.

Nothing in *United States* v. *Rauscher*, 119 U. S. 407, prevents the imprisonment of respondent under the sentence imposed upon him before his flight.

*Mr. Terence J. McManus,* with whom *Mr. W. M. K. Olcott* was on the brief, for appellee:

The order appealed from was in complete accord with well-settled principles of law, with treaty provisions and with the statutes of the United States relating to the subject of extradition.

Almost all of the important authorities on the law of nations have held that, without a treaty stipulation, one government is not under any obligation to surrender a fugitive from justice to another government for trial. Foelix, Droit. Int. Prive, II, § 608; Twiss, Law of Nations, Time of Peace, ed. 1884, § 238; Phillimore, 3d ed., I, 517; Creasy, Int. Law, 202; Lewis, For. Juris. 37; Pomeroy, Int. Law, Woolsey's ed. (1886), 236; Lawrence's Wheat. (1863) 233.

The law of nations embraces no provision for the surrender of persons who are fugitives from the offended laws of one country to the territory of another. It is only by treaty that such surrender can take place. Mr. Rush, Sec. of State, to Mr. Hyde de Neuville, April 9, 1817, MSS. notes to For. Leg. II, 218; Mr. Webster, Sec. of State to Mr. d'Argaiz, June 21, 1842; Webster's Works, VI, 399–405.

Hence, the right to surrender rests, as between two sovereign governments, exclusively upon treaty provisions.

When treaty stipulations have been entered into, the same writers and many others of equal authority hold that when a fugitive has been surrendered to the demanding Government, he shall be tried only for the specific offense for which his surrender was granted, and that in the event of his not being tried for that offense, or having been tried and acquitted thereon, he is entitled to a reasonable time to leave the country before being arrested upon any other charge of crime alleged to have been committed prior to his extradition. 1 Moore on Extradition, p. 255; Billot. Traite de l'Extradition, 308; Field's Int. Code, § 237; Wharton, Conf. of Laws, § 846. And see also *Cosgrave* v. *Whipney*, 174 U. S. 63; *Ex parte Coy*, 32 Fed. Rep. 911; *People* v. *Stout*, 81 Hun, 336.

Neither the British "Extradition Act of 1870" nor § 5275, Rev. Stat., has been revoked, abrogated or even modified, by the treaty of July 12, 1889, § VI of which is manifestly an unequivocal ratification of the controlling authority of the existing statutory procedure regulating extradition in both countries.

The treaty of 1889 was not an original compact. It was expressly declared to be "Supplementary to the Tenth Article of the Treaty" of 1842.

Therefore, under all the rules of construction, it is to be considered in conjunction with that treaty, and with the cases in which the meaning of its terms was judicially determined.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

It does not appear that any movement has been made or notice given by this Government to try the respondent on the indictment for the crime for which he has been extradited, but his imprisonment in Sing Sing Prison is upon a conviction of a crime for which the Canadian court had refused to extradite him, and is entirely different from the one for which he was extradited. In other words, he has been extradited for one offense and is now imprisoned for another, which the Canadian court held was not, within the treaty, an extraditable offense.

Whether the crime came within the provision of the treaty was a matter for the decision of the Dominion authorities, and such decision was final by the express terms of the treaty itself. Article 2, Convention of July 12, 1889, 26 Stat. 1508; United States Treaties in Force, April 28, 1904, 350, 351.

We can readily conceive that if the Dominion authorities, after the Court of King's Bench had decided that the crime of which respondent had been convicted and for which extradition had been asked was not extraditable, and the request for extradition had, therefore, been refused, had been informed on the subsequent proceeding for extradition on the other indictment that it was not the intention of this Government to try respondent on that indictment, but that having secured his extradition on that charge, it was the intention

of this Government to imprison him on the judgment of conviction, they would have said that such imprisonment would not be according to the terms of the treaty, and they would have refused to direct his extradition for the purpose stated.

Although the surrender has been made, it is still our duty to determine the legality of the succeeding imprisonment, which depends upon the treaty between this Government and Great Britain, known as the Ashburton treaty of 1842, 8 Stat. 572–576, Art. 10, and the subsequent one, called a convention, concluded in 1889, and above referred to.

The treaty of 1842 had no express limitation of the right of the demanding country to try a person only for the crime for which he was extradited, and yet this court held that there was such a limitation, and that it was to be found in the "manifest scope and object of the treaty itself;" that there is "no reason to doubt that the fair purpose of the treaty is, that the person shall be delivered up to be tried for that offense and for no other." *United States* v. *Rauscher*, 119 U. S. 407, 422, 423.

Again, at the time of the decision of the *Rauscher case* there were in existence sections 5272 and 5275, Rev. Stat. (3 Comp. Stat. p. 3595), both of which are cited and commented upon in that case, and in the course of the opinion of Mr. Justice Miller, at p. 423, he said:

"The obvious meaning of these two statutes, which have reference to all treaties of extradition made by the United States, is that the party shall not be delivered up by this Government to be tried for any other offense than that charged in the extradition proceedings; and that, when brought into this country upon similar proceedings, he shall not be arrested or tried for any other offense than that with which he was charged in those proceedings, until he shall have had a reasonable time to return unmolested to the country from which he was brought. This is undoubtedly a Congressional construction of the purpose and meaning of extradition treaties,

such as the one we have under consideration, and, whether
it is or not, it is conclusive upon the judiciary of the right
conferred upon persons brought from a foreign country into
this under such proceedings.

"That right, as we understand it, is that he shall be tried
only for the offense with which he is charged in the extradition
proceedings and for which he was delivered up, and that if
not tried for that, or after trial and acquittal, he shall have a
reasonable time to leave the country before he is arrested
upon the charge of any other crime committed previous to
his extradition."

Mr. Justice Gray, page 433, in his concurring opinion,
places that concurrence upon the single ground that these
sections clearly manifest the will of the political department
of the Government in the form of an express law that the person
should be tried only for the crime charged in the warrant of
extradition, and he should be allowed a reasonable time to
depart out of the United States before he could be arrested
or detained for any other offense. Both grounds were con-
curred in by a majority of the whole court.

If the question now before us had arisen under the treaty of
1842 and the sections of the Revised Statutes above men-
tioned, we think the proper construction of the treaty and
the sections would have applied to the facts of this case and
rendered the imprisonment of the respondent illegal. The
manifest scope and object of the treaty itself, even without
those sections of the Revised Statutes, would limit the im-
prisonment as well as the trial to the crime for which extra-
dition had been demanded and granted.

It is true that the tenth article of the treaty contained no
specific provision for delivering up a convicted criminal, but
if otherwise delivered, he could not have been punished upon
a former conviction for another and different offense.

The claim is now made on the part of the Government that
"the manifest scope and object of the treaty" of 1842 are
altered and enlarged by the treaty or convention of July 12,

1889. The second, third, sixth and seventh articles of that convention are set forth in the margin.[1]

It will be perceived that the second article provides that no person surrendered shall be triable or tried, *or be punished*, for any political crime or offense, while article three provides that no person surrendered shall be triable or be tried (leaving out the words "or be punished") for any crime or offense committed prior to the extradition, other than the offense for

---

[1] Article II.

A fugitive criminal shall not be surrendered, if the offense in respect of which his surrender is demanded be one of a political character, or if he proves that the requisition for his surrender has in fact been made with a view to try or punish him for an offense of a political character.

No person surrendered by either of the high contracting parties to the other shall be triable or tried, or be punished for any political crime or offense, or for any act connected therewith, committed previously to his extradition.

If any question shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the government in whose jurisdiction the fugitive shall be at the time shall be final.

Article III.

No person surrendered by or to either of the high contracting parties shall be triable or be tried for any crime or offense, committed prior to his extradition, other than the offense for which he was surrendered, until he shall have had an opportunity of returning to the country from which he was surrendered.

Article VI.

The extradition of fugitives under the provisions of this convention and of the said tenth article shall be carried out in the United States and in Her Majesty's dominions, respectively, in conformity with the laws regulating extradition for the time being in force in the surrendering State.

Article VII.

The provisions of the said tenth article and of this convention shall apply to persons convicted of crimes therein respectively named and specified, whose sentence therefor shall not have been executed.

In a case of a fugitive criminal alleged to have been convicted of the crime for which his surrender is asked, a copy of the record of the conviction and of the sentence of the court before which such conviction took place, duly authenticated, shall be produced, together with the evidence proving that the prisoner is the person to whom such sentence refers.

which he was surrendered, until he shall have had an opportunity for returning to the country from which he was surrendered. Hence, it is urged that, as punishment for another offense of which the person had been convicted is not in so many words expressly prohibited in and by article three, a requisition may be obtained for one crime under that article, and when possession of the person is thus obtained, he may be punished for another and totally- different crime of which he had been convicted before extradition.

We do not concur in this view. Although if the words "or be punished" were contained in the third article, the question in this case could not, of course, arise, yet we are satisfied that the whole treaty, taken in connection with that of 1842, fairly construed does not permit of the imprisonment of an extradited person under the facts in this case.

The mere failure to use these words in the third article does not so far change and alter "the manifest scope and object" of the two treaties as to render this imprisonment .legal. The general scope of the two treaties makes manifest an intention to prevent a State from obtaining jurisdiction of an individual whose extradition is sought on one ground and for one expressed purpose, and then having obtained possession of his person to use it for another and different purpose. Why the words were left out in the third article of the convention of 1889, when their insertion would have placed the subject entirely at rest, may perhaps be a matter of some possible surprise, yet their absence cannot so far alter the otherwise plain meaning of the two treaties as to give them a totally different construction.

In addition to the provisions of the treaty of 1889, we find still in existence the already mentioned sections of the Revised Statutes, which prohibit a person's arrest or trial for any other offense than that with which he was charged in the extradition proceedings, until he shall have had a reasonable time to return unmolested from the country to which he was brought.

It is argued, however, that the sections in question have

been repealed by implication by the treaty or convention of 1889, and that the respondent, therefore, cannot obtain any benefit from them. We see no fair or reasonable ground upon which to base the claim of repeal. Repeals by implication are never favored, and a later treaty will not be regarded as repealing an earlier statute by implication, unless the two are absolutely incompatible and the statute cannot be enforced without antagonizing the treaty. *United States* v. *Lee Yen Tai*, 185 U. S. 213. If both can exist the repeal by implication will not be adjudged. These sections are not incompatible with the treaty or in any way inconsistent therewith. We find nothing in the treaty which provides that a person shall be surrendered for one offense and then that he may be punished for another, such as is the case here. The most that can be asserted is that an inference to that effect perhaps might be drawn from the absence in article III, of positive language preventing such punishment. But that slight and doubtful inference, resting on such an insufficient foundation, is inadequate to overcome the positive provisions of the statute and the otherwise general scope of both treaties, which are inconsistent with the existence of such right.

It is urged that the construction contended for by the respondent is exceedingly technical and tends to the escape of criminals on refined subtleties of statutory construction, and should not, therefore, be adopted. While the escape of criminals is, of course, to be very greatly deprecated, it is still most important that a treaty of this nature between sovereignties should be construed in accordance with the highest good faith, and that it should not be sought by doubtful construction of some of its provisions to obtain the extradition of a person for one offense and then punish him for another and different offense. Especially should this be the case where the Government surrendering the person has refused to make the surrender for the other offense on the ground that such offense was not one covered by the treaty.

Our attention has been directed to various other treaties

between this Government and other nations, where provision is expressly made in regard to punishment. They frequently provide that no person shall be triable or tried "or be punished" for any other offense than that for which he was delivered up, until he has had an opportunity of returning to the country from which he was surrendered. But because in some of the treaties the words "or be punished" are contained we are not required to hold that in the case before us the absence of those words permits such punishment, when that construction is, as we have said, contrary to the manifest meaning of the whole treaty, and also violates the statutes above cited. The order of the Circuit Court is

*Affirmed.*

MR. JUSTICE MOODY did not sit in the case and took no part in its decision.