**UNITED STATES ex rel. DONNELLY v. MULLIGAN, U. S. Marshal.**

**No. 193.**

Circuit Court of Appeals, Second Circuit.

Dec. 3, 1934.

Samuel Hershenstein, of New York City (T. Bernard Eisenstein, of New York City, of counsel), for appellant.

Edward H. Lockwood, of New York City (R. D. Murray, of New York City, of counsel), for British Consul-General, etc.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This appeal reviews a dismissal of a writ of habeas corpus sued out by the appellant when he was arrested on a warrant for his extradition from this country to Canada. Appellant was indicted by the New York county grand jury on December 16, 1930, and was arrested in France on July 18, 1933. He was there tried for a crime against that government and imprisoned. After the expiration of his sentence, in October, 1933, on application of the United States, he was extradited, under this government's treaty with the republic of France, to the United States. He was surrendered to the United States agents in April, 1934, and brought to New York on May 3, 1934. On May 21, 1934, upon the recommendation of the district attorney of New York county, the relator was discharged on his own recognizance. This became necessary because the complaining witness against him, in the New York county charge of crime, died, and the district attorney of the county could not proceed with the trial of that indictment. Within 30 days the United States marshal, at the request of the Canadian government, arrested him for extradition to Canada on a charge pending there, which arose prior to his extradition from France to the United States.

Appellant seeks to sustain the writ for the reason that his imprisonment was invalid in that he was held in violation of the Extradition Treaty between the United States and the republic of France (Jan. 6, 1909, 37 Stat. 1526). On this appeal there is submitted a copy of a communication addressed by the Ministry of Foreign Affairs of the French Republic to the Canadian Legation at Paris. This communication was in reply to a request for extradition of the appellant to the Canadian government. In part it reads:

"In case the Canadian Government has the intention at some future date to request the extradition of Donnelly from the Government of the United States, the Government of the Republic would be glad to support such a request."

This communication was not before the District Court, but was submitted to us at the argument.

Article 7 of the Extradition Treaty between France and the United States (37 Stat. 1531) reads as follows:

"No person surrendered by either of the High contracting Parties to the other shall be triable or tried or be punished for any crime or offence committed prior to his extradition, other than the offence for which he was delivered up, nor shall such person be arrested or detained on civil process for a cause accrued before extradition, unless he has been at liberty for one month after having been tried, to leave the country, or, in case of conviction, for one month after having suffered his punishment or having been pardoned."

The history of extradition reveals it to be a creature of modern progress. Through the ancient world and down the Middle Ages, the practice of giving up a person by one government to another for an offense committed in the other was known, but the practice seems to have served a different purpose than the extradition of today. Extradition was a means of preserving political security. Moore's Treatise on Extradition and Interstate Rendition, pp. 8-13. To-day, however, the end sought is to attain social security. The rapid advancement and progress in intercommunications amongst nations, and the ease with which a criminal can flee from the country of his crime and seek an asylum in another country, the lessening of national barriers, all tend to minimize the fact that crime has always been considered a local matter. It is true that punishment of crime remains a local matter, but the offense is against the moral sense of nations as reflected in their criminal codes.

The early writers on extradition held that it was a matter of "right," and that the nation harboring a criminal had the "duty" to deliver him to a requesting nation. Grotius, de Jure Belli ac Pacis, lib. 2, c. 11; Vattel, lib. II, c. 6; Burlemaqui, Tome II, part IV, c. 3. Grotius and Vattel considered extradition of a criminal to be obligatory on the harboring nation because the interests of society demand that crimes be punished. In the nineteenth century, Chancellor Kent, in the Matter of Daniel Washburn, 4 Johns. Ch. 106, citing Vattel, Martens, Grotius, Heineccius, and other Publicists, held it to be the duty, under the law of nations, for one nation to give up to another a criminal fleeing from the justice of that other nation. This position seems to have still some adherents, for, as Prof. Puente points out in speaking of Latin American Practice (Principles of International Extradition in Latin America, 28 Mich. Law Review [1929-30] 665):

"The courts in Latin America have regarded nations as bound to one another not only by contractual ties, but by the stronger bonds of moral solidarity. They consider the treaty as adding nothing new to the substance and character of the moral obligation, but as giving it only a greater and more definite—a contractual—measure of certainty and clothing it with a legal sanction. * * * The treaty is not creative, but merely declaratory, of international law."

The more modern writers, however, are united in considering extradition not as a duty, but as a matter of favor or of comity. Oppenheim (International Law [3d Ed.] § 327) says that:

"States have always upheld their competence to grant asylum to foreign individuals as an inference from their territorial supremacy."

See, also, 6 Webster's Works, 303, 311; Sir Edward Creacy, First Platform of International Law, 202; Martens, Droit des Gens, Liv. III, c. 3, § 101; Foelix, Traité de droit international privé (1843) § 569; Wheaton's International Law (6th Ed.) vol. 1, 212; Pigot, Extradition, 8.

The law has followed the modern trend. Lord Russell in Re Arton (1896) 1 Q. B. 108, said:

"The law of extradition is without doubt founded upon the broad principle that it is to the interest of the civilized communities, that crimes acknowledged to be such should not go unpunished, and it is part of the comity of nations that one state should afford to another every assistance towards bringing persons guilty of such crimes to justice."

In United States v. Rauscher, 119 U. S. 407, 411, 7 S. Ct. 234, 236, 30 L. Ed. 425, the court said:

"It is only in modern times that the nations of the earth have imposed upon themselves the obligation of delivering up these fugitives from justice to the states where their crimes were committed, for trial and punishment. This has been done generally by treaties. * * * Prior to these treaties, and apart from them, * * * there was no well-defined obligation on one country to deliver up such fugitives to another; and, though such delivery was often made, it was upon the principle of comity; * * * and

222

it has never been recognized as among those obligations of one government towards another which rest upon established principles of international law."

■ Thus it is now clear that apart from a treaty a state has no duty to deliver up a person who has sought asylum within its boundaries. If the state wishes, it can afford him a refuge and protection from the state which he has fled. Of course, a state is under no duty to afford asylum to a fugitive; it may expel him from its territories if it choose, and without complaint from the individual who is expelled. But it may grant to him an asylum, and, if such is done by it, no breach of international law is involved. The discretion, it should be noted, is that of the state to which the criminal has fled. Thus it is apparent that treaties, as special compacts, are self-imposed limitations on the rights of government. By a treaty a state agrees and obligates itself to do something it was free not to do. By the treaty before the court, the republic of France has agreed to deliver up criminals who are guilty of certain crimes where there is sufficient evidence of guilt to permit placing them on trial. It has agreed to give them up for a special purpose, namely, that they may be brought to justice for an offense committed in this country. As said of this in United States v. Rauscher, supra, page 422 of 119 U. S., 7 S. Ct. 234, 242:

"As this right of transfer, the right to demand it, the obligation to grant it, the proceedings under which it takes place, all show that it is for a limited and defined purpose that the transfer is made, it is impossible to conceive of the exercise of jurisdiction in such a case for any other purpose than that mentioned in the treaty, and ascertained by the proceedings under which the party is extradited, without an implication of fraud upon the rights of the party extradited, and of bad faith to the country which permitted his extradition."

It is this matter of bad faith which would be here involved if extradition of the appellant to Canada be granted. The republic of France gave up the appellant to this country so that this country might try him for this specific crime and no other. The Congress of the United States, by title 18, § 659, U. S. C. (18 USCA § 659), has clothed the criminal with protection while he is here so that he may be tried only for the crime for which he has been extradited. For the United States to exercise its power over the appellant in a manner other than that which has been expressly permitted by the republic of France

would be nothing short of bad faith. This country had no right to the appellant apart from the right secured by the treaty. In pursuance of this treaty, the appellant was given up in order that he might be tried for a definite crime specified in the extradition. Appellant having been discharged and the purpose for which the republic of France gave him up having been fulfilled, the republic of France has a right that he be permitted to return to the asylum which it, as a favor to this country, had, for one purpose only, withdrawn from him.

Moore on Extradition, vol. 1, p. 272, says that there is no jurisdiction for any purpose other than trial for the offense for which the criminal was extradited. This author says:

"As to all acts antecedent to his surrender, save only the offense or offenses for which he was delivered up, the prisoner is entitled to the same measure of protection as if he had not left the jurisdiction of the surrendering government. This is what is meant by his 'right of return.' He is not required to return; but he must have opportunity to do so; and until he has had such opportunity, the courts have not, as was said in the Rauscher case, 'jurisdiction of the person * * * so as to subject him to trial' for other offenses than that for which he has been surrendered. The fugitive having been delivered up for the sole purpose of being tried for the offense with which he was charged, and the disability of the courts being jurisdictional, it follows that the prisoner is not liable to other process for civil any more than for general criminal purposes."

It might be added, nor for "sui generis" purposes.

The court in Re Baruch (C. C.) 41 F. 472, 473, said:

"The proceeding under the treaty is for a limited and defined purpose only, and * * * the exercise of jurisdiction over the prisoner for any other purpose than that mentioned in the treaty, until he has an opportunity to return, is * * * bad faith to the country which permitted the extradition."

See Lascelles v. Georgia, 148 U. S. 537, 545, 13 S. Ct. 687, 37 L. Ed. 549; In re Reinitz, 39 F. 204, 208, 4 L. R. A. 236 (C. C. N. Y.).

■■ The United States could not have obtained the relator from France for the purpose of extraditing him to Canada. This was not the purpose for which the French government granted extradition or favored this country. If the United States had asked France to

deliver up appellant for such purpose as it is now intended to exercise in granting Canada's request for extradition, France might rightly have refused. The treaty does not expressly forbid extradition to a third country, nor does it consent. In the absence of consent, the right to deny asylum to the criminal is that of France. There is an unrestricted right of refusal to consent to extradition from France to Canada in the former government. The language of the communication or document of the French government to the Canadian government heretofore referred to and quoted from is not addressed to the United States. It is addressed by the Minister of Foreign Affairs of the French Republic to the Canadian Legation in Paris. It is not a document upon which this government would be justified in granting the relief sought by the extradition to Canada. The willingness to consent that this prisoner be taken to Canada is not a consent of extradition to a third country within the terms of the treaty between this country and France. Provisions of treaties of France with other countries which expressly contain consents for extradition to third countries might well be argued to indicate that France intended in the treaty with the United States to withhold such consent.

The appellant had a place of asylum in France and could be deprived of this only by the action of the French government. France, under international law, has a right to give him asylum or take it from him. Asylum necessarily means absolute immunity from the jurisdiction of another state, subject only to the will of the state of asylum, and it must be borne in mind that the right of the state of asylum is sovereign and unlimited, excepting in so far as the state freely imposes limits on itself. We are not advised officially whether or not France would deliver the appellant to Canada at the latter's request. Questions of treaty between Great Britain and France are involved. Conceding that the crime for which Canada seeks to try the appellant is an extraditable offense within the terms of the extradition treaty of Great Britain and France, we are not aware that the terms of the treaty would be satisfied. We do not know that sufficient evidence would be introduced to satisfy France that the ap-

pellant is a proper subject for extradition. Evidence which might be sufficient for this country might or might not be sufficient for France. France, as his state of asylum, has a sovereign right to safeguard and protect its sovereignty, even though that may be construed as an injustice to the world; it has a right to decide for itself whether it will deliver the appellant, who sought its sheltering asylum, to a demanding state. The only impingement upon this asylum has been the extradition for trial of the indictment found against the appellant in New York. As stated in Johnson v. Browne, 205 U. S. 309, 321, 27 S. Ct. 539, 543, 51 L. Ed. 816, 10 Ann. Cas. 636:

"While the escape of criminals is, of course, to be very greatly deprecated, it is still most important that a treaty of this nature between sovereignties should be construed in accordance with the highest good faith, and that it should not be sought, by doubtful construction of some of its provisions, to obtain the extradition of a person for one offense and then punish him for another and different offense."

If a prisoner may not be subject to arrest on civil process after extradition from a foreign country (In re Reinitz, supra), by the same reasoning he cannot be arrested and held for extradition (not a criminal offense) to a third country.

It should be borne in mind that, while the *formalities* attending an extradition are purely administrative functions which the accused and the state of asylum can properly waive, the *diplomatic guaranties*—in the instant case, the 30-day period of immunity—which are accorded for the benefit of the accused, cannot be violated by the demanding state, without the consent of the surrendering state. Puente, Note on International Extradition, 26 Ill. Law Review (1931–1932) 210, 215.

Under the terms granting extradition, the prisoner has one month after he has been at liberty to leave the country and return to France. If at the end of that time he has not done so, the United States is free to consider the request of Canada for his extradition to that country.

The order is reversed, and writ sustained.