**UNITED STATES of America ex rel. Emilio MARTINEZ-ANGOSTO, Relator,**

**v.**

**Redfield MASON, Rear Admiral and Commandant of Third United States Naval District, 90 Church Street, New York, New York, or such person or persons, if any, who might have such Relator in custody, Respondent.**

United States District Court
S. D. New York.

July 15, 1964.

Edith Lowenstein, New York City, Edward Q. Carr, Jr., New York City, of counsel, for relator.

Robert M. Morgenthau, U. S. Atty., by Roy Babitt, New York City, of counsel, for respondent.

EDELSTEIN, District Judge.

This is an application by relator, Emilio Martinez-Angosto, for a writ of habeas corpus. See 28 U.S.C. § 2243 (1952). The relator is a 23 year old alien, a native and citizen of Spain, and a member of the Spanish Navy. On or about November 25, 1960, the relator deserted the Spanish destroyer "ALCALA GALIANO" while in port in Philadelphia. The relator was subsequently apprehended by an officer of the Immigration and Naturalization Service (INS) on December 6, 1963, and later placed in respondent's custody, where he remained until the return date of the petition for the writ. On that date a hearing was held and the court, with the consent of the Government, released the relator into the custody of his wife and the local parish priest, Father Anglis, pending the decision on the application for the writ. Thus petitioner is still technically in the custody of respondent but has been given the privilege of remaining with his family pending a decision. The order of this court filed January 24, 1964, provides, however, that the relator must surrender himself to the custody of the respondent within three days "following the decision of the court in this case." The events which led up to the relator's custody and which are not in dispute are as follows:

Pursuant to the Mutual Defense Assistance Agreement between Spain and the United States, September 26, 1953, the United States and Spain, prior to September 26, 1960, agreed to transfer a United States Naval Destroyer designated the "U.S.S. JARVIS DD-799" to the Government of Spain. The destroyer was to be renamed, after the transfer, the "ALCALA GALIANO." Upon the delivery by the United States pursuant to the Treaty, the "ALCALA GALIANO," formerly the "JARVIS" was to become a Spanish warship in the service of the Spanish Government. The transfer was effected, as appears from the certificate of delivery in the record, on November 3, 1960, in Philadelphia, which is in the Fourth Naval District.

Pursuant to Order No. 000031 of September 26, 1960, issued by the Military Assistance Advisory Group, Madrid, Spain, (MAAG), the relator was authorized to sail to the United States aboard

an American vessel in October 1960, together with 16 Spanish naval officers and 256 other Spanish naval enlisted men. The purport and object of these instructions was to ship the 272 members of the Spanish Navy to the United States so that they could form the new crew complement of the "ALCALA GALIANO" after it was transferred to the service of the Spanish Government. The relator's name appears on the transfer crew list of the U.S.S. "JARVIS," which has been attached and included in the Navy file before the court. The relator and the other members of the transfer crew departed aboard the United States Naval Vessel "ROSE" from Cartagena, Spain, arrived in New York, and on or about October 17, 1960, were taken to Philadelphia to become the crew of the "ALCALA GALIANO", nee "U.S.S. JARVIS."

Subsequent to the transfer of the U.S.S. "JARVIS" to the Spanish Government, the "ALCALA GALIANO" became a Spanish warship actively in the service of the Spanish Government. Later, in November 1960, the Commander of the "ALCALA GALIANO" advised the Commandant of the Fourth United States Naval District that the relator and another crewman were missing from aboard the vessel since November 25, 1960, and were presumed to be deserters. The matter was referred from the Commandant of the Fourth Naval District at Philadelphia to United States Naval Intelligence at about the same time as the INS had been notified and had accepted investigative jurisdiction of the matter. The Immigration Service file reveals that at 2:00 p. m. on November 30, 1960, the service had been advised by the Spanish Government of the relator's identity as a member of the Spanish Navy and of his desertion.

On December 6, 1963, an investigator of the INS located the relator in Brooklyn, New York. The investigative report, which was submitted to the court as part of the entire record in this case, shows that relator was interrogated by the INS investigator. Relator gave his identity and admitted that he had deserted the "ALCALA GALIANO" while she was in port in Philadelphia. He voluntarily furnished the Immigration investigators with a Social Security card bearing a name other than his own, his Spanish Navy identification card, his marriage certificate showing marriage to a United States citizen, and his child's birth certificate. These documents show that on August 23, 1962, he was married to Carmen Ana Melendez, a United States citizen, and on June 27, 1963, their daughter, Diana Martinez, was born. At the time of his apprehension the relator was employed as a general helper at the Elm Coat Company in Brooklyn, and had worked for the same employer for two and one-half years.

The INS took relator into custody and advised the Office of Naval Intelligence of his apprehension. On December 9, 1963, the Consul General of Spain communicated with the Commandant of the Third Naval District at New York and informed the Commandant that the INS was holding relator. The Consul General then made a request for detention and custody by the respondent pursuant to a 1903 Treaty, pending arrangements for relator's departure aboard a Spanish ship. The Treaty pursuant to which relator's custody and detention was sought is the 1903 Treaty of General Relations and Friendship with Spain, July 3, 1902. Art. XXIV, 33 Stat. 2117 (promulgated April 20, 1903) by which the contracting nations agreed on procedures to be followed in apprehending and expediting the return of deserters "forming part of the crew of ships of war or merchant vessels of their Nation, who may have deserted in one of the ports of the other." [1] In compliance with the direction of the District Director of Immigra-

1. Article XXIV of the 1903 Treaty of Friendship and General Relations between this country and Spain, 33 Stat. 2117, provides in pertinent part:

"The Consuls-General, Consuls, Vice-Consuls and Consular-Agents of the two countries may respectively cause to be arrested and sent on board or cause to be

tion and Naturalization, and the request of the Office of Naval Intelligence, relator was on that day taken into the custody of the respondent.

On that same day, December 9, 1963, relator was interviewed by a Foreign Liaison Officer of the Office of Naval Intelligence in New York City. This report is also included as part of the record before the court. The report relates, in substance, that the relator was brought to the interviewing officer's office by two uniformed personnel of the INS; that the interviewing officer identified himself as a representative of the United States Navy and the relator identified himself, upon request for his name, that he was Emilio Martinez-Angosto; that Martinez-Angosto freely and voluntarily stated that he had arrived in the United States in October 1960; that he was brought here from Spain aboard a United States Navy ship as one of the Spanish Navy crew members of the destroyer "ALCALA GALIANO" which was being transferred to Spain by the United States at Philadelphia; that upon his arrival in New York he and the rest of the Spanish Navy crew were transported by bus to the Philadelphia Naval shipyard where they assumed the duties as the crew of the "ALCALA GALIANO;" that his rank in the Spanish Navy was that of a non-rated sailor or seaman assigned to do clerk's work in the ship's office. The relator admitted the desertion and stated that he liked America and wished to stay here.

During the interview the following papers and documents which were turned over to the Office of Naval Intelligence by the INS were shown to him:

Spanish Armed Forces Identification Card issued to Emilio MARTINEZ ANGOSTO.

Foreign Naval Trainee Identification Card issued by the U. S. Navy to Emilio MARTINEZ ANGOSTO, SN, Spanish Navy.

A Spanish Certificate of Baptism No. 000167 for Emilio, son of Emilio MARTINEZ PONT and Florentina ANGOSTO SANCHEZ.

A Spanish Certificate of "Solteria" No. 000126 for Emilio MARTINEZ ANGOSTO.

A Social Security card No. 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 for Emilio MARTINEZ.

Certificate of Birth No. 114 for Carmen Ana MELENDEZ born 10 February 1946 in Puerto Rico.

Certificate of Birth No. 156-63-327482 for Diana MARTINEZ, born June 27, 1963, at Brooklyn, New York.

Martinez acknowledged that these documents belonged to him and that he was the Emilio Martinez mentioned therein. The officer's report indicates that the relator's custody was explained to him, i. e., that as a deserter from the Spanish Navy he was being held, pursuant to a Treaty between the two countries subject to his being returned to Spain as soon as arrangements could be made. He was also advised of his right to counsel and

returned to their own country, such officers, seamen or other persons forming part of the crew of ships of war or merchant vessels of their Nation, who may have deserted in one of the ports of the other.

"To this end they shall respectively address the competent national or local authorities in writing, and make request for the return of the deserter and furnish evidence by exhibiting the register, crew list or other official documents of the vessel, or a copy or extract therefrom, duly certified, that the persons claimed belonged to said ship's company. On such application being made, all assistance shall be furnished for the pursuit and arrest of such deserters, who shall even be detained and guarded in the gaols of the country pursuant to the requisition and at the expense of the Consuls-General, Consuls, Vice-Consuls or Consular Agents, until they find an opportunity to send the deserters home.

"If, however, no such opportunity shall be had for the space of three months from the day of the arrest, the deserters shall be set at liberty, and shall not again be arrested for the same cause. It is understood that persons who are citizens or subjects of the country within which the demand is made shall be exempted from the provisions of this article."

was advised that his wife should obtain a lawyer to represent him and that such an attorney would have visitation rights at any time. At the conclusion of the interview Martinez was transported to the Third Naval District Brig. In an affidavit annexed to the moving papers, dated January 16, 1964, the relator admitted and reiterated the essential facts concerning his alien seaman's status, his desertion, his identity, and his voluntary divulgence of information as well as his voluntary relinquishment of identifying documents.

Although the validity of the Treaty is not under attack relator's counsel, nevertheless, urges that relator's custody is invalid because the Treaty cannot be implemented and it therefore can have neither applicability nor impact upon relator. Relator's first contention is that the Treaty, while still in effect, "cannot be advanced as a valid basis for [Martinez-Angosto's] detention or delivery to the Spanish authorities because the treaty provision is not self-executing and the repeal of Rev.Stat. § 5280 eliminated a law that was essential to carry the treaty into effect as domestic law of the United States." [2] More particularly, relator argues that § 5280 of the Rev.Stat., 4 Stat. 359, as amended, 10 Stat. 614 [3] was essential to the implementation of Article XXIV of the 1903 Treaty with Spain concerning the prompt facilitation of the return of deserting merchant and naval seamen to their vessels. Sec. 5280 was enacted in 1829 prior to the 1903 Friendship Treaty with Spain, 4 Stat. 359 (1829). It established a procedure that required judicial authorization for the arrest and detention of deserters upon the request of any foreign consul seeking the restoration of a deserting seaman pursuant to the respective treaties that the United States had with many foreign nations. It is contended that the repeal of § 5280 Rev.Stat. in its entirety by § 17 of the Seamen's Act of 1915, 38 Stat. 1164 [4] rendered Article XXIV of the

2. Relator's Memorandum of Law, p. 4.

3. Revised Statutes § 5280, now repealed, provides in pertinent part:
"On application of a consul or vice-consul of any foreign government having a treaty with the United States stipulating for the restoration of seamen deserting, made in writing, stating that the person therein named has deserted from a vessel of any such government, while in any port of the United States, and on proof by the exhibition of the register of the vessel, ship's roll, or other official document, that the person named belonged, at the time of desertion, to the crew of such vessel, it shall be the duty of any court, judge, commissioner of any circuit court, justice, or other magistrate, having competent power, to issue warrants to cause such person to be arrested for examination. If, on examination, the facts stated are found to be true, the person arrested not being a citizen of the United States, shall be delivered up to the consul or vice-consul, to be sent back to the dominions of any such government, or, on the request and at the expense of the consul or vice-consul, shall be detained until the consul or vice-consul finds an opportunity to send him back to the dominions of any such government. No person so arrested shall be detained more than two months after his arrest; but at the end of that time shall be set at liberty, and shall not be again molested for the same cause. * * *"

4. Seamen's Act of 1915, 38 Stat. 1184, provides, in pertinent part:
"Sec. 16. That in the judgment of Congress articles in treaties and conventions of the United States, in so far as they provide for the arrest and imprisonment of officers and seamen deserting or charged with desertion from merchant vessels of the United States in foreign countries, and for the arrest and imprisonment of officers and seamen deserting or charged with desertion from merchant vessels of foreign nations in the United States and the Territories and possessions thereof, and for the cooperation, aid, and protection of competent legal authorities in effecting such arrest or imprisonment and any other treaty provision in conflict with the provisions of this Act, ought to be terminated, and to this end the President be, and he is hereby, requested and directed, within ninety days after the passage of this Act, to give notice to the several Governments, respectively, that so much as hereinbefore described of all such treaties and conventions between the United States and foreign Governments will terminate on the expiration of such

Friendship Treaty inoperable because it created a procedural vacuum by abrogating the judicial procedure which, it is claimed, was originally contemplated as essential to the implementation of the 1903 Treaty. And, the argument concludes, that since the 1903, Friendship Treaty is not self-executing and since no implemental or "gap-filling" statutory scheme has ever been enacted by Congress since the repeal of § 5280, the summary arrest and detention of relator by the INS was unsupportable and illegal.

Secondly, counsel for the relator contends that despite relator's desertion, relator as an alien is entitled to the Fifth Amendment's Due Process protection. This being so, the summary arrest and detention without a full hearing by the INS and by the respondent is, it is claimed, in violation of his constitutional right. In advancing this line of reasoning the relator's counsel points out that § 287 of the Immigration and Nationality Act, 8 U.S.C. § 1357,[5] which sets forth the scope of the arrest and interrogation powers of Immigration officers and employees, does not contain a provision that sanctions the summary arrest and detention of the relator. Counsel argues that the admitted facts demonstrate that relator was not an alien "likely to escape." See 8 U.S.C. § 1357(a) (2),[6] nor a person

periods after notices have been given as may be required in such treaties and conventions.

"Sec. 17. That upon the expiration after notice of the periods required, respectively, by said treaties and conventions and of one year in the case of the independent State of the Kongo, so much as hereinbefore described in each and every one of said articles shall be deemed and held to have expired and to be of no force and effect, and thereupon section fifty-two hundred and eighty and so much of section four thousand and eighty-one of the Revised Statutes as relates to the arrest or imprisonment of officers and seamen deserting or charged with desertion from merchant vessels of foreign nations in the United States and Territories and possessions thereof, and for the cooperation, aid, and protection of competent legal authorities in effecting such arrest or imprisonment, shall be, and is hereby, repealed."

5. 8 U.S.C. § 1357, provides:

"Powers of immigration officers and employees—

"Powers without warrant

"(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

"(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

"(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, or expulsion of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

"(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States; and

"(4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, or expulsion of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States. Any such employee shall also have the power to execute any warrant or other process issued by any officer under any law regulating the admission, exclusion, or expulsion of aliens."

6. Ibid.

suspected of committing a felony within the meaning of that provision. Relator also contends that the Treaty of 1903 cannot abrogate the Constitution and that relator should have been afforded the protection of an arrest with a warrant, together with a hearing as to the legality of his detention.

In the alternative, counsel for Martinez-Angosto argues that relator was entitled to a deportation hearing in accordance with the applicable procedures. See 8 U.S.C. § 1252 (1952).

The respondent seeks to undermine the petitioner's position by emphasizing that the provisions of the Treaty set forth precisely the procedure that is to be followed in the apprehension and return of Spanish Naval deserters. The Government maintains that the Treaty is self-executing and does not require further proceedings. It is sufficient, the Government claims, that the relator has been identified as a deserter from a Spanish naval vessel, having deserted in a port in the United States. Our Court of Appeals quite recently, in United States ex rel. Perez-Varella v. Esperdy, 285 F.2d 723 (2d Cir. 1960) cert. denied, 366 U.S. 925, 81 S.Ct. 1352, 6 L.Ed. 2d 384 (1961), held that the Treaty is self-executing and governs the transfer of deserting seamen, such as relator, and "[t]his decision based on similar facts cannot be disregarded * * and must be followed." See United States v. One 1959 Buick 4-Door Sedan, 188 F.Supp. 155 (N.D.N.Y.1960); Abbott v. United States, 61 F.Supp. 989 (S.D.N.Y.1945). Judge Learned Hand held that the Treaty of 1903 was applicable with respect to "crews of ships of war," notwithstanding the fact that § 16 of the Seamen's Act of 1915, 38 Stat. 1184, repealed the treaty with respect to deserters from merchant vessels. An extensive examination of the post 1916 legislation concerning the subject matter of deserters from foreign warships lead Judge Hand and the Court to the conclusion that Congress' explicit exclusion of crews of ships of war from the repealing legislation rendered the act applicable to Perez-Varella. Thus Perez-Varella's status and the summary arrest and return upon the request of the Spanish Consul was deemed in accord with the only procedure found applicable to him, i. e., the 1903 Treaty. United States ex rel. Perez-Varella v. Esperdy, supra at 724–725.

The relator recognizes the viability of Perez-Varella as precedent but denies that it is controlling as to him because he claims the cases are distinguishable inasmuch as the court in Perez-Varella did not consider the repeal of § 5280 of the Revised Statutes. See Brief of United States of America, Petition for Rehearing, Docket No. 26066, 2d Cir. 1960 cert. denied, 366 U.S. 925, 81 S.Ct. 1352, 6 L.Ed.2d 384 (1961). This argument is clearly without merit. However, even if § 5280 had not been repealed totally by the express language of § 17 of the Seamen's Act of 1915, it would not govern the procedures under the 1903 Treaty which, admittedly, is in full force and effect. The Treaty was entered into and promulgated some fifty years after the last Congressional modification of § 5280, which was in 1855. The Treaty was subsequently renegotiated with Spain and Greece after 1915 to provide that only that portion of Article XXIV of the Treaty which covered desertion from commercial craft would be voided and that the treaty obligations dealing with deserters from ships of war would continue to apply. See 5 Hackworth, DIGEST OF INTERNATIONAL LAW 309–312, 316–317 (1943), 1 THE FOREIGN RELATIONS OF THE UNITED STATES 54–67 (1919). The Treaty sets forth its own procedural scheme, however elementary, for the return of deserting seamen from ships of war. Section 5280 and the subsequently enacted 1903 Treaty each provide for different procedures for the arrest and detention of deserters. The statute and the Treaty are inconsistent, and cannot be construed harmoniously because the Treaty can be executed by "competent national authorities" while the statute, § 5280, requires implementation through

judicial examination. Relator's argument ignores the well-established precedent that a Treaty, being later in time but equal in force prevails over earlier legislation. See Charlton v. Kelly, 229 U.S. 447–463, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); Johnson v. Browne, 205 U.S. 309, 321, 27 S.Ct. 539, 51 L.Ed. 816 (1907).

An examination of similar treaties enacted before the Treaty in suit is illuminating. A study of the language of these treaties demonstrates that when Congress, pursuant to its treaty making powers, expects to provide for enforcement of a deserting seaman treaty by a judge, justice, or any judicial officer, it makes such a purpose explicit. See Article XXXIV of the 1858 Treaty with Bolivia, 12 Stat. 1020 (1858) ("courts, judges"); Article XII of the 1881 Treaty with Roumania, 23 Stat. 711 (1881) ("competent local authorities"). Congress' use of the term "judicial officers" in treaties antedating the Friendship Treaty with Spain and its use of the term "competent national authorities" in the 1903 Spanish Treaty evinces a studied and intentional choice on the part of Congress to leave the implementation of the 1903 Treaty to the competent national authorities within the respective countries having jurisdiction over deserting seamen. In the United States these authorities are the Immigration and Naturalization Service and the United States Navy.

A review of the authorities leads inevitably to the conclusion that the 1903 Treaty is self-executing and governs the procedure for relator's arrest, detention and return. See United States ex rel. Perez-Varella v. Esperdy, supra.

Relator's further attempt to distinguish Perez-Varella is entirely devoid of merit. Relator points out that Perez-Varella came to the United States aboard the Spanish naval vessel from which he deserted, whereas the relator herein came aboard an American vessel and deserted the Spanish vessel sometime later. This is a distinction without a difference, for having made an entry into the United States he is subject to the desertion treaty which draws no distinction between a deserter such as Perez-Varella, who came to the United States on a Spanish vessel and deserted here, and the relator in this case, who boarded a Spanish vessel here and then deserted her. Both were members of the crew of Spanish ships of war and both deserted those ships of war at a port in the United States. The Treaty requires no more.

Relator has also argued that Medina Fernandez v. Hartman, 260 F.2d 569 (9th Cir. 1958) and not Perez-Varella is applicable to his situation. Medina Fernandez v. Hartman is inapplicable to relator's case and, in effect, it reaffirms the position taken by our Court of Appeals in Perez-Varella. For in Medina, the Ninth Circuit recognized the applicability of Article XXIV of the Treaty with respect to foreign naval personnel deserting ships of war in the United States, but held that the Treaty was inapplicable because Medina had deserted in Mexico, not in an American port, although he had entered the United States at San Diego, California, upon his arrival.[7]

Finally, there is no merit to petitioner's contention that the arrest and detention procedures in the instant case constituted a denial of liberty without due process of law. Undeniably, petitioner, as an alien present within the borders of this country, is entitled to the protection of the Fifth Amendment's Due Process clause, cf. Kaplan v. Tod, 267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585 (1925) and there is no issue taken by the Government with the claim that the con-

7. The court has studied Tucker v. Alexandroff, 183 U.S. 424, 22 S.Ct. 195, 46 L.Ed. 264 (1902) and finds it distinguishable and inapposite with relation to the instant case. As for the relator's argument that there is some point in time when a deserter loses his extra-territorial status and is no longer a member of the military force of the foreign nation, Judge Hand's quotation from Chief Justice Marshall's opinion in the Exchange, 7 Cranch 116, 143, 11 U.S. 116, 3 L.Ed. 287 (1812) which appears in the Perez-Varella decision, provides the complete answer to it.

duct of the competent national authorities must measure up to the constitutional standard of fairness which the Due Process clause imposes. This issue is whether, considering the particular circumstances of the case, these standards were met. The court finds that they were.

Due process of law means, essentially, fundamental fairness. See Brinkerhoff-Faris Co. v. Hill, 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930). The determination of whether the entire proceedings fall below the Plimsoll line of due process of fundamental fairness is an imprecise one, see Fikes v. Alabama, 352 U.S. 191, 199, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) (Frankfurter, J., concurring opinion), and its determination cannot be made on the basis of an exact logarithmic formula. See Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 162–163, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring opinion). The constitutional requirement is met when having "due regard for the practicalities and peculiarities of the case," there has been basic fairness. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

Although notice and hearing are basic to the fabric of Due Process, it has been the custom in this Government's treaty relations with foreign states to treat deserters summarily and to subject them to arrest and return to their native countries upon the request of consuls and upon obtaining evidence that they were members of the crew who had deserted in a United States port. See Tucker v. Alexandroff, supra, 183 U.S. at 461–462, 22 S.Ct. 195 (list of treaties dealing with summary arrest and detention of alien deserters from naval ships). The 1903 Treaty procedures supersede the internal law of the United States so that the Immigration and Naturalization Act is not applicable to petitioner and he is not entitled to a deportation hearing pursuant to 8 U.S.C.A. § 1252(a). See United States ex rel. Perez-Varella v. Esperdy, 187 F.Supp. supra at 380.

But the relator has been accorded due process of law in the instant circumstances. He was apprised of all factors concerning his status and, in fact, he has consistently acknowledged, together with his counsel, the two factors relevant to the operation of the Treaty—his identity as a member of the crew of a Spanish warship and the fact of desertion in a United States port.

The relator's attack upon the arrest without warrant and the subsequent detention to the effect that it was not authorized by § 287 again fails to take into account that the treaty provisions laid down the applicable procedure and "the pursuit and arrest of the deserter" and his detention in jail was carried out pursuant to the Treaty which supersedes the Internal Immigration Law in general, and which also supersedes the search and arrest provisions of the Act, § 287, 8 U.S.C. § 1357, in particular. Cases such as Tsimounis v. Holland, 132 F.Supp. 754 (E.D.Pa.1954) aff'd. 228 F.2d 907 (3rd Cir.) and Valerio v. Mulle, 148 F.Supp. 546 (E.D.Pa.1956) which deal with the validity of an arrest of an alien who is not explicitly covered by a Treaty are distinguishable. Such aliens are subject to deportation pursuant to the Immigration and Nationality Act and their arrest and detention is not tested by the terms of a supervening Treaty procedure, such as here applicable, but solely by compliance or non-compliance of INS officers with the Act, namely § 287. Consequently, officers of the Service had a right to interrogate relator because relator was and is an "alien," and there was a question raised by the Spanish Consul concerning "his right to be or to remain in the United States," 8 U.S.C. § 1357(a) (1). But once his desertion status was determined, the United States Navy and the Immigration and Naturalization Service, who were both "competent national authority," were required to follow the procedures set forth in the Treaty, and not the Immigration Act. United States ex rel. Perez-Varella v. Esperdy, supra.

In sum, the procedure followed was the only one available to the respondent and respondent acted in accordance with his duty to uphold the laws of the United States embodied in the Treaty. As has been previously stated, the present case is not one in which an alien is being deported under the laws of the United States and is therefore entitled to a formal hearing before his ties with this country may be terminated. Cf. Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Rather, this case arises out of a particular treaty pursuant to which this country has agreed to exercise its sovereignty to return deserting naval seamen to Spain. The test of due process in this case is whether petitioner was accorded the procedures that the Treaty authorized. There is no doubt that he was and he was entitled to no more. See Grin v. Shine, 187 U.S. 181, 191, 23 S.Ct. 98, 47 L.Ed. 130 (1902); Fong Yue Ting v. United States, 149 U.S. 698, 714, 13 S.Ct. 1016, 37 L.Ed. 905 (1893).

The petition for the writ of habeas corpus is dismissed. So ordered.