285 F.2d 723
 UNITED STATES of America ex rel. Juan PEREZ-VARELLA, Appellant,
v.
P. A. ESPERDY, District Director of the New York District of the Immigration and Naturalization Service, Appellee.
 No. 185.
 Docket 26606.
 United States Court of Appeals Second Circuit.
 Argued November 17, 1960.
 Decided December 22, 1960.
 
 Ernest Fleischman and Delson, Levin & Gordon, New York City, for appellant.
 Roy Babitt, S. Hazard Gillespie, Jr., U. S. Atty. for Southern Dist. of New York, New York City, for appellee.
 Before LUMBARD, Chief Judge, and HAND and WATERMAN, Circuit Judges.
 HAND, Circuit Judge.
 
 
 1
 This is an appeal from an order dismissing a petition for habeas corpus for the release of the relator from the custody of the New York District Director of Immigration and Naturalization. The petitioner is a sailor, serving as a cook on board a "training ship" of the Spanish Navy. He arrived in Miami last March and was allowed with the other members of the crew the usual sightseeing visits ashore. He returned each night and sailed with his ship to New York, where he arrived in April 1960. At that port he went ashore some time in May but did not return before the ship left that month and thus became a "deserter." On May 10 the Consul General of Spain advised the Immigration and Naturalization Service of these facts and the "Service" started to search for him. He was finally arrested on the 8th of July, at which time he told the officers of the "Service" that, even when he "signed on," he had meant to desert when the ship arrived in the United States. The officials who arrested him seized some documents, which were not, however, used in determining his arrest or detention. On July 11 he appeared before an officer of the "Service" who told him that he might say anything that he chose, but that it would be used against him. The relator then gave his name, but refused any further information. On July 14 the Spanish Consul General advised the "Service" that he was trying to make arrangements for the relator to leave on a Spanish ship, but that a pending writ of habeas corpus prevented him from proceeding. Such a writ was pending before Judge Bicks who dismissed the petition from which this appeal was taken.
 
 
 2
 The relator's position is that at the time of the arrest he was not subject to Article XXIV of the treaty of 1903 between the United States and Spain 33 Stat. 2105, which provided that "Consular-Agents of the two countries may respectively cause to be arrested and sent on board or caused to be returned to their own country, such officers, seamen or other persons forming part of the crew of ships of war or merchant vessels of their Nation, who have deserted." The "Agents" are to write to "national or local authorities," requesting "the return of the deserter and furnish evidence by exhibiting the register, crew list * * or a copy * * * duly certified, that the persons claimed belonged to said ship's company." Thereupon "all assistance shall be furnished for the pursuit and arrest of such deserters, who shall even be detained and guarded in the gaols of the country * * * until they" (the "Agents") "find an opportunity to send the deserters home."
 
 
 3
 In 1915 Congress passed Chapter 153 of the Laws of 1915, 38 Stat. 1164, whose caption provided that it was "to promote the welfare of American seamen in the merchant marine * * * to abolish arrest and imprisonment as a penalty for desertion and to secure the abrogation of treaty provisions in relation thereto." Section 16 of this statute (38 Stat. 1184) declared that Congress wished to "terminate" the treaties and conventions of the United States that provided "for the arrest and imprisonment of officers and seamen," who deserted from "merchant vessels of foreign nations in the United States," and that such provisions ought to be terminated as "in conflict with the provisions" of the act then passed which in many respects ameliorated the position of seamen including deserters. This statute expressly left untouched the procedure in existing treaties so far as they applied to the "crews of ships of war," and the case at bar depends upon whether any act passed after 1915 has repealed what was so left of the treaty with Spain. The relator argues that although the Acts of 1917, 1924 and 1952, concerned the naturalization as well as the deportation of aliens, in general terms they all covered deserters from "ships of war," and therefore repealed what was left of the treaty of 1903. For example, the Act of 1917 (Chapter 29, § 1, 39 Stat. 874), declared that "the term, `seaman' as used in this Act shall include every person signed on the ship's articles and employed in any capacity on board any vessel arriving in the United States from any foreign port or place." The Act of 1924, 43 Stat. 153, does not contain anything pertinent to the treaty provisions; but the Immigration and Naturalization Act of 1952, § 1101(a) (10) repeats in substance the language of the Act of 1917: i. e., the term "crewman" shall include a person serving "in any capacity on board a vessel or aircraft." It appears to us that we should not interpret this language we have just quoted from the Acts of 1917 and 1952 as intended to repeal that part of the treaty that Congress had left untouched two years earlier by the Act of 1915. It is true that § 1 of Chapter 29 if read in entire disregard of the purposes of that chapter covers the case of a deserter from a foreign ship of war; and § 34 of the Act provides that "any alien seaman who shall land in a port of the United States contrary to the provisions of this Act shall be * * * taken into custody and brought before a board of special inquiry for examination as to his qualifications for admission * * * and, if not admitted, * * * shall be deported * * *" (39 Stat. 896). We can find nothing in the Act of 1917 that makes § 34 applicable to sailors on foreign ships of war, particularly in the light of Congress's explicit exclusion of crews of ships of war in the Act of 1915.
 
 
 4
 There is no reason, a priori, for assuming an intent to repeal the treaty from the words used in § 1 of the Act of 1917 covering deserters from merchant vessels. It had been our custom for over a century in treaties with other states to treat deserters summarily, and as subject to arrest and return upon the request of consuls and upon evidence only that they were members of the crews. A list of over forty such treaties appears in Tucker v. Alexandroff, 183 U.S. 424, 461, 462, 22 S.Ct. 195, 46 L.Ed. 264. Moreover there was an obvious valid reason for the distinction in the Act of 1915 between merchant vessels and ships of war. The treaties were all reciprocal: that is, they granted to ships of the United States the same immunity which they accorded to the other contracting state, in each case insuring an adequate crew to work the ship back to her home port without the delay of a judicial hearing. Patently by 1915 it had been decided that the interest of merchant ships in such drastic control of their crews was no longer desirable, and it is conceivable that this change of attitude might have included ships of war.
 
 
 5
 However, the two situations are of altogether different gravity. To tie up a merchant vessel during the pendency of a hearing would seldom impose any serious injury on the national interests of the state to which she belonged; but to tie up a ship of war might imperil the defense of that state, especially if the deserter, or deserters, were necessary to her operation. This seems certainly to have been the reason for § 16 of the Act of 1915; and, as we have said, there is nothing in the record to suggest that the contracting states had mutually meant to expose themselves to such dangers.
 
 
 6
 The situation of a seaman on a ship of war in a foreign port is analogous to that of a soldier in troops that have been given leave to pass through the territory of another friendly state. He remains subject to the same controls that apply while the regiment is in its own territory. The language of Chief Justice Marshall in The Exchange, 7 Cranch 116, 143, 3 L.Ed. 287, though spoken of a ship of war itself, is in point: "She constitutes a part of the military force of her nation; acts under the immediate and direct command of the sovereign; is employed by him in national objects. He has many and powerful motives for preventing those objects from being defeated by the interference of a foreign state. Such interference cannot take place without affecting his power and his dignity. The implied license, therefore, under which such vessel enters a friendly port, may reasonably be construed, and it seems to the court, ought to be construed, as containing an exemption from the jurisdiction of the sovereign, within whose territory she claims the rites of hospitality." Although, this language was used of a ship of war itself, we cannot see, as we have just said, why it is not equally applicable to the crew without which she is useless for defense.
 
 
 7
 Finally, it is plain that a ship used to train seamen to serve on ships of war should be equally immune from local jurisdiction. It would obviously be an absurd distinction to protect only that part of the military establishment of another state which is already qualified, but to deny protection to those who are in process of preparation.
 
 
 8
 Order affirmed.