UNITED STATES of America ex rel.
Emilio MARTINEZ–ANGOSTO,
Relator-Appellant,

v.

Redfield MASON, Rear Admiral and Commandant, Third United States Naval District, 90 Church Street, New York, New York, Respondent-Appellee.

No. 269, Docket 29223.

United States Court of Appeals
Second Circuit.

Argued Dec. 16, 1964.

Decided April 7, 1965.

home. He was then taken to his home and there he produced a marriage certificate, the birth certificates of his children, and a Spanish seamen's card. The agents then took him to the INS offices where he was interviewed, with the aid of a Spanish interpreter, given lunch, confined to a room until the evening, then removed to the INS detention quarters and kept there for three days. On December 9, he was taken from these quarters by uniformed guards to the Office of Naval Intelligence and interviewed by a Naval Foreign Liaison Officer. At the conclusion of the interview, Martinez-Angosto was imprisoned in the Third Naval District Brig. Three days later he was interviewed again, this time by two naval officers. The custody was continued with a view of turning him over to the captain of a Spanish cruiser on December 27, to be returned to Spain.

■ Through the aid of his wife, his family priest, and the Legal Aid Society, on December 20 a petition for a writ of habeas corpus was filed in the Southern District of New York to test the legality of his detention. In a decision dated July 15, 1964 and reported at 232 F.Supp. 102, Judge Edelstein dismissed the petition.[1] We reverse. The imprisonment of Martinez-Angosto constitutes a deprivation of liberty without due process of law in violation of the Fifth Amendment. His arrest and imprisonment by the INS agents were unlawful, and the Navy does not have the lawful authority to imprison him.

In 1903 the United States adhered to a Treaty of General Relations and Friendship with Spain, 33 Stat. 2105. Article XXIV[2] of that Treaty dealt with the re-

Edward Q. Carr, Jr., New York City (Edith Lowenstein, New York City, of counsel), for relator-appellant.

Roy Babitt, Sp. Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the So. Dist. of New York), for respondent-appellee.

Before FRIENDLY, HAYS and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge:

On the morning of December 6, 1963 two men confronted Emilio Martinez-Angosto at the factory where he worked. They identified themselves as agents of the Immigration and Naturalization Service [INS] and asked his name and for his papers. He gave his name, and informed the agents that his papers were at

1. At the hearing on the petition, the district court, with respondent's consent, released Martinez-Angosto to the custody of his wife and the local parish priest, pending a final decision on his petition, and on condition that he surrender himself to respondent within three days following the decision, if so required. Apparently Martinez-Angosto is still in the custody of his wife and priest; but there is no doubt that habeas corpus is

the appropriate means of testing the legality of his detention by the Navy, see generally, Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

2. ARTICLE XXIV: "The Consuls-General, Consuls, Vice-Consuls and Consular-Agents of the two countries may respectively cause to be arrested and sent on board or cause to be returned to their own country, such officers, seamen or other persons forming part of the crew

turn of naval deserters, and it resembled, in essential outline, provisions appearing in a great number of other treaties the United States had entered into with other nations during the nineteenth century, listed in Tucker v. Alexandroff, 183 U.S. 424, 430, 461, 22 S.Ct. 195, 198, 209, 46 L.Ed. 264, 267, 279 (1902); 5 Hackworth, Digest of International Law, 310 (1943). As the Treaty is presently binding on the United States, Treaties in Force, January 1, 1965, p. 174, n. 2, Spanish consular officers have the right to "cause to be arrested" and "cause to be returned to their own country" seamen forming part of the crew of ships of war who have deserted in one of the ports of the other. However, the consular officers were not given the power to arrest, to detain and to put on board those claimed as naval deserters; instead this power was reserved by the treaty to "competent national or local authorities." These authorities were entrusted with the responsibility and power to arrest and imprison a deserter, with a view to surrendering him to Spanish authorities for return to Spain. The exercise of this power was predicated on the following determinations by the "competent national or local authorities": (1) the individual sought by the Spanish authorities had deserted from a Spanish ship of war in a United States port; (2) the individual actually arrested and detained is the deserter sought; (3) this individual is not a citizen of the United States; and (4) this individual had not previously been arrested for the same cause and set at liberty because he had been detained for more than three months from the day of his arrest without the Spanish authorities having found an opportunity to send him home. These competent authorities also have the responsibility of setting the deserter free if his detention endures for more than three months without the Spanish authorities having found an opportunity to send him home. Although the treaty requires that these determinations be made by "competent national or local authorities," and that the arrest and detention be made by such authorities, it does not clothe any individuals or officers of the federal government, or state and municipal government, with the competence or lawful authority to do these things. It relies upon the internal laws of the United States to provide the lawful authority.

When the United States entered this Treaty with Spain, a federal law, Rev. Stat. § 5280 (1875),[3] originally enacted

of ships of war or merchant vessels of their Nation, who may have deserted in one of the ports of the other.

"To this end they shall respectively address the competent national or local authorities in writing, and make request for the return of the deserter and furnish evidence by exhibiting the register, crew list or official documents of the vessel, or a copy or extract therefrom, duly certified, that the persons claimed belonged to said ship's company. On such application being made, all assistance shall be furnished for the pursuit and arrest of such deserters, who shall even be detained and guarded in the gaols of the country pursuant to the requisition and at the expense of the Consuls-General, Consuls, Vice-Consuls or Consular Agents, until they find an opportunity to send the deserters home.

"If, however, no such opportunity shall be had for the space of three months from the day of the arrest, the deserters shall be set at liberty, and shall not again be arrested for the same cause. It is understood that persons who are citizens or subjects of the country within which the demand is made shall be exempted from the provisions of this article.

"If the deserter shall have committed any crime or offense in the country within which he is found, he shall not be placed at the disposal of the Consul until after the proper Tribunal having jurisdiction in the case shall have pronounced sentence, and such sentence shall have been executed."

3. Section 5280: "On application of a consul or vice-consul of any foreign government having a treaty with the United States stipulating for the restoration of seamen deserting, made in writing, stating that the person therein named has deserted from a vessel of any such government, while in any port of the United States, and on proof by the exhibition of the register of the vessel, ship's roll, or other official document, that the person named belonged, at the

as the Act of March 2, 1829, 4 Stat. 359, as amended by the Act of February 24, 1855, 10 Stat. 614, existed, which authorized certain federal officers to enforce this treaty provision.[4] Specifically, "any court, judge, commissioner of any circuit court, justice, or other magistrate, having competent power"[5] was clothed with the authority to issue warrants to cause the arrest of the individual sought as a deserter. These authorities were to make the above critical determinations, conduct "an examination" for those purposes, and, being satisfied that the conditions of the Treaty were satisfied, to detain the deserter pending his surrender to the foreign authorities. The Treaty with Spain provided that the deserter would be set at liberty and never to be arrested for the same cause if he were detained for more than three months without the Spanish authorities having found

an opportunity to send him home; in Rev.Stat. § 5280 the period was two rather than three months. Because of this discrepancy the Treaty could be viewed, not as impliedly abrogating Rev. Stat. § 5280 as it applied to seamen deserting from Spanish ships, but perhaps modifying it as it so applied; cf. Cook v. United States, 288 U.S. 102, 118–119, 53 S.Ct. 305, 77 L.Ed. 641 (1933); 13 Ops. Atty.Gen. 354, 358 (1870).

■ In 1915 Congress enacted a Seamen's Act, 38 Stat. 1164, to "promote the welfare of American seamen in the merchant marine of the United States; to abolish arrest and imprisonment as a penalty for desertion and to secure the abrogation of treaty provisions in relation thereto; and to promote safety at sea." Section 16 [6] of the Act "requested

time of desertion, to the crew of such vessel, it shall be the duty of any court, judge, commissioner of any circuit court, justice, or other magistrate, having competent power, to issue warrants to cause such person to be arrested for examination. If, on examination, the facts stated are found to be true, the person arrested not being a citizen of the United States, shall be delivered up to the consul or vice-consul, to be sent back to the dominions of any such government, or, on the request and at the expense of the consul or vice-consul, shall be detained until the consul or vice-consul finds an opportunity to send him back to the dominions of any such government. No person so arrested shall be detained more than two months after his arrest; but at the end of that time shall be set at liberty, and shall not be again molested for the same cause. If any such deserter shall be found to have committed any crime or offense, his surrender may be delayed until the tribunal before which the case shall be depending, or may be cognizable, shall have pronounced its sentence, and such sentence shall have been carried into effect."

4. The court below held that even if Rev. Stat. § 5280 was not repealed by section 17 of the Seamen's Act "it would not govern the procedures under the 1903 Treaty" because the Treaty set "forth its own procedural scheme" and the procedures of the Treaty and statute are "different" and "inconsistent." 232 F.

Supp. at 108. In our view, however, the procedures are complementary, not inconsistent, for the statute determined who were the competent authorities referred to in the Treaty. The analogous provision in the Russian Treaty of 1832 set out in Tucker v. Alexandroff, 183 U.S. at 429, 22 S.Ct. at 197, also contained an elementary procedural scheme and even went one step beyond the Spanish Treaty, and delegated responsibility for enforcing the treaty to "the competent tribunals, judges, and officers" rather than merely to "competent national or local authorities." But the courts in Tucker v. Alexandroff, which were much closer to that phase of our history, viewed § 5280 as the basis of the commissioner's authority even though the Treaty referred to "competent * * * officers." See also 103 F. 198, 199 (Dist. Ct.E.D.Pa.1900); 107 F. 437 (3 Cir. 1901).

5. The words "having competent power" did not await a further authorization by the internal laws of the United States and thereby created an endless circle; instead they appeared to pertain to such ordinary restrictions of power as, for example, those restricting the power of district judges to the judicial districts of their appointment. Cf. United States v. Kelly, 108 F. 538 (Dist.Ct.Or.1901).

6. Section 16: "That in the judgment of Congress articles in treaties and conventions of the United States, in so far as

and directed" the President to terminate all deserting seamen treaty provisions in respect to merchant seamen; and section 17 [7] repealed Rev.Stat. § 5280. It would have made more sense for Congress to repeal only so much of § 5280 as related to the arrest and imprisonment of deserters from merchant vessels, saving it for deserters from ships of war, because section 16 only directed the abrogation of treaty provisions dealing with deserters from merchant vessels. There is strong evidence in the legislative history that Congress only intended this *pro tanto* repeal of § 5280.[8] But this evidence is not sufficient to overcome the unambiguous statutory language, compare Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), Cawley v. United States, 272 F.2d 443, 445 (2 Cir. 1959), and this language repeals § 5280 *in toto*. The practical consequences of this seeming overextended repeal of § 5280 were minimized by the actual response to the

they provide for the arrest and imprisonment of officers and seamen deserting or charged with desertion from merchant vessels of the United States in foreign countries, and for the arrest and imprisonment of officers and seamen deserting or charged with desertion from merchant vessels of foreign nations in the United States and the Territories and possessions thereof, and for the co-operation, aid, and protection of competent legal authorities in effecting such arrest or imprisonment and any other treaty provision in conflict with the provisions of this Act, ought to be terminated, and to this end the President be, and he is hereby, requested and directed, within ninety days after the passage of this Act, to give notice to the several Governments, respectively, that so much as hereinbefore described of all such treaties and conventions between the United States and foreign Governments will terminate on the expiration of such periods after notices have been given as may be required in such treaties and conventions."

7. Section 17: "That upon the expiration after notice of the periods required, respectively, by said treaties and conventions and of one year in the case of the independent State of the Kongo, so much as hereinbefore described in each and every one of said articles shall be deemed and held to have expired and to be of no force and effect, and thereupon section fifty-two hundred and eighty and so much of section four thousand and eighty-one of the Revised Statutes as relates to the arrest or imprisonment of officers and seamen deserting or charged with desertion from merchant vessels of foreign nations in the United States and Territories and possessions thereof, and for the cooperation, aid, and protection of competent legal authorities in effecting such arrest or imprisonment, shall be, and is hereby, repealed."

8. Some of the various bills that eventually culminated in the Seamen's Act of 1915 and which received the approval of Congress, specifically repealed "so much of sections 4081 and 5280 of the Revised Statutes as relates to the arrest or imprisonment of officers and seamen deserting or charged with desertion from merchant vessels. * * *" 50 Cong.Rec. 5668, 5670 (1913). One bill contained a section that repealed only so much of § 5280 as it applied to merchant seamen and at the same time contained a closing sentence: "Section 5280, Revised Statutes, repealed." 49 Cong.Rec. 4565 (1913). Another version also contained a section repealing only so much of § 5280 as applied to merchant seamen and contained a final provision: "That section 5280, Revised Statutes, except as hereinbefore provided, be, and the same is hereby, repealed." 50 Cong.Rec. 5714 (1913). These catch-all provisions just quoted, caused some concern and discussion, even on the floor of Congress, 49 Cong.Rec. 4583 (1913); 50 Cong.Rec. 5750, 5791 (1913). Although amendments seeking the elimination of these provisions were withdrawn, two things seemed as clear as these matters could ever be: no one, including the sponsors of the bills, had any specific idea as to the content of § 5280 and there was no consideration of the effect of a total repeal of § 5280 on the enforcement of deserting seamen treaty provisions as they related to sailors on ships of war. (Section 5280 did not explicitly embody the dichotomy between merchant and naval seamen, as the 1903 Treaty did.) The language of section 17 of the 1915 Act relating to the repeal of § 5280 can most immediately be traced back to a bill introduced by Representative Alexander at 51 Cong.Rec. 14245 (1914); H.R.Rep. 852, 63 Cong.2d Sess.; in that bill the

mandate of section 16. Within several years following the enactment of the Seamen's Act of 1915 all deserting seamen treaty provisions, except those with Spain and Greece, were terminated in respect to both merchant and naval seamen, although section 16 of the Act only called for the termination of such provisions in respect to merchant seamen. With Greece and Spain the response was more measured; and the relevant articles were abrogated only so far as they applied to merchant seamen. See generally, 5 Hackworth, Digest of International Law, 309–12 (1943); Treaties in Force, January 1, 1965, p. 79, n. 1, p. 174, n. 2; cf. Van Der Weyde v. Ocean Trans. Co., Ltd., 297 U.S. 114, 117, 56 S.Ct. 392, 80 L.Ed. 515 (1936).

The net outcome of these less than coordinated efforts of the executive and legislative branches was to leave Article XXIV of the 1903 Treaty with Spain binding on the United States insofar as it applied to deserters from ships of war, and, at the same time, to dismantle the domestic enforcement machinery previously established in Rev.Stat. § 5280, which had been in existence for almost a century and which was presumably within the contemplation of those drafting Article XXIV. To this day, the void created by the repeal of § 5280 has not been filled with a similar general grant of authority, even though the Treaty relies upon the domestic law for the determination of which of its officers would be competent to arrest and imprison the alleged deserter and to make the determinations of law and fact requisite to his continued detention and surrender to the Spanish authorities.

In this instance, the Spanish authorities improvised and the American officers responded. What evolved, in an *ad hoc* fashion, was a network of cooperation between the INS and the Navy, which was not authorized in law and which, incidentally, would not even have satisfied the previously repealed Rev.Stat. § 5280. The commanding officer of the Spanish

ship from which Martinez-Angosto allegedly deserted first notified the Commandant of the Fourth Naval District of the desertion. The Commandant notified the United States Naval Intelligence, and the information was relayed to the INS. This occurred in the last two months of 1960. Three years later, after receiving an anonymously furnished lead, INS agents questioned and then arrested Martinez-Angosto. After the arrest, he was interviewed by an INS "investigator," who, on the basis of this interview, and the papers Martinez-Angosto surrendered to the arresting agents, decided that Martinez-Angosto was the deserter sought. Martinez-Angosto was then imprisoned, and the Office of Naval Intelligence and the Spanish authorities were informed. The Spanish Consul General then wrote to Rear Admiral Redfield Mason, Commandant of the Third Naval District, informing him of Martinez-Angosto's detention by the INS. The 1903 Treaty was invoked; the letter stated that "the detained sailor" would be "sent back to Spain" on December 27, 1963 and concluded: "In the meantime, it would be appreciated if you could arrange for this sailor to be picked up at Immigration and transferred to your Navy Brig, where he is requested to be held until the date of his departure." The Navy immediately took custody of Martinez-Angosto. He was interviewed by a Naval Foreign Liaison Officer and three days later was interviewed again, this time by two liaison officers. These Naval officers were satisfied as to the prisoner's identity and his desertion, and that the 1903 Treaty was applicable, and filed reports to this effect several days later. Martinez-Angosto's imprisonment was continued in the Third Naval District Brig, with the view to surrendering him in several weeks to the Spanish authorities for return to Spain.

The Navy and the INS agents and investigator furnished all assistance for the pursuit, arrest and detention of the alleged deserter, but they were not

language effecting a *pro tanto* repeal of § 5280 was dropped, and the language

of section 17 substituted without explanation.

"competent national or local authorities" for performing these acts nor for making the determinations of law and fact upon which this action must be predicated. There is no statute, nor even a Presidential authorization that gives the Navy any competence in these affairs. The INS is the enforcement agency of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101, and the limits of its authority were transgressed by arresting and imprisoning Martinez-Angosto under color of enforcing the 1903 Treaty. Section 287(a) (1) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a) (1), gives the INS agents authority to interrogate any "alien," and apparently Martinez-Angosto fell within the statutory definition of "alien," 8 U.S.C. § 1101(a) (3), even though the agents were attempting to enforce the Treaty rather than the Act. However, the INS agents had the authority to arrest and imprison an individual residing within the United States, as Martinez-Angosto clearly had been for the previous three years, only if this action were a prelude to deportation proceedings under section 242 of the Act, 8 U.S.C. § 1252. See 8 C.F.R. § 242.2. Martinez-Angosto was arrested without a warrant; and appellee seeks to justify that on the basis of section 287(a) (2), 8 U.S.C. § 1357(a) (2), which authorizes an INS agent to arrest an alien without an arrest warrant. But this authority is conditioned, at a minimum, upon a reasonable determination that the alien is likely to escape before an arrest warrant can be obtained, upon a prompt arraignment "before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States" (Section 287(a) (2), 8 U.S.C. § 1357(a) (2)), and upon the initiation of Section 242 deportation proceedings if "the examining officer is satisfied that there is prima facie evidence establishing that the arrested alien is in the United States in violation of the immigration laws," 8 C.F.R. § 287.3. There was no risk of Martinez-Angosto escaping during the time needed to get a warrant, and more fundamentally this arrest was not made, nor was the confinement imposed with a view to enforcing the Immigration and Nationality Act by conducting Section 242 deportation proceedings. Instead Martinez-Angosto was turned over to the Navy; and Naval Foreign Liaison Officers assumed the ultimate responsibility of determining whether the Treaty applied and for returning him to the Spanish authorities.[9]

Neither the INS nor the Navy had the lawful authority to do what they did, and this defect was not cured by the fact that there was virtually no dispute as to Martinez-Angosto's identity and his desertion. The interview reports filed by the INS investigator and Naval Officers stated that Martinez-Angosto admitted the following account: He was born in Spain of Spanish parents and was conscripted into the Spanish Navy. An American naval ship brought him to the United States[10] as part of a crew to man a destroyer being transferred to Spain by the United States. Some weeks after the transfer took place and after the crew had manned the ship, which was in Philadelphia, Martinez-Angosto traveled to upstate New York with another sailor, with an intention to desert, and overstayed his shore leave. Within several months he moved to Brooklyn, New York, where he has worked as a general helper in a fac-

---

9. We have not been unmindful of Nishimura Ekiu v. United States, 142 U.S. 651, 662, 12 S.Ct. 336, 339, 35 L.Ed. 1146 (1892): "A writ of habeas corpus is not like an action to recover damages for an unlawful arrest or commitment, but its object is to ascertain whether the prisoner can lawfully be detained in custody; and, if sufficient ground for his detention by the government is shown,

he is not to be discharged for defects in the original arrest or commitment."

10. Appellee, in its brief to this court, states that "all visa requirements and other documentation required by the immigration statutes of the United States" were "waived." See 22 C.F.R. §§ 41.36, 41.62; see also 22 C.F.R. § 41.22(e) and Gordon & Rosenfield, Immigration Law and Procedure 109 n. 73a (1964), for NATO countries.

tory since June 1961 and where he was married, in August 1962, to an American citizen. Although there is some question as to whether Martinez-Angosto fully understood the situation he was in and whether he had an adequate opportunity to seek the assistance of counsel,[11] the interview reports claim that he "freely" made those admissions to his investigators, and neither this claim nor the content of these alleged admissions has been contested in these proceedings. However, these admissions as to his identity and desertion are not sufficient to clothe either the INS or the Navy with the authority to arrest and imprison him.

Even though Martinez-Angosto admitted his identity and the fact of desertion, there were legal issues, which are not entirely free from difficulty, that had to be resolved in determining whether the 1903 Treaty was applicable to him. There is his claim, which there is no need to assess here, that his marriage entitled him to American citizenship, see section 319 of the Immigration and Nationality Act, 8 U.S.C. § 1430 (see also section 245, 8 U.S.C. § 1255), rendering the 1903 Treaty inapplicable to him since it explicitly excluded American citizens from its coverage. There is also the question, which we leave unresolved, whether Martinez-Angosto could be considered to "have deserted in one of the ports" of the United States within the meaning of the 1903 Treaty, in light of the stringent interpretation given those words in Medina-Fernandez v. Hartman, 260 F.2d 569 (9 Cir. 1958) and the claim that the

desertion occurred in upstate New York, where Martinez-Angosto supposedly was when his shore leave expired. Further, there is also the problem of determining whether the Treaty would apply to a situation where the sailors had arrived in the United States on an American ship, not on a Spanish ship of war, and the ship of war had not yet been put in the active service of Spain, although the formal transfer of the ship to Spain had been completed several weeks before the alleged desertion and the Spanish crew had since then manned it. In other cases there may be a substantial factual controversy as to the identity and desertion of the individual sought by the Spanish authorities, and if the INS or Navy would be without lawful authority or legal competence to resolve that dispute, as it certainly would be, then it is difficult to see how the INS or Navy had lawful authority or legal competence to resolve the issues presented in Martinez-Angosto's case. But more fundamentally, even if an individual admitted all the facts required by the Treaty, and no legal issues were present in determining whether the Treaty was operative, this would not clothe the INS or the Navy with legal competence to execute the Treaty by arresting and imprisoning the individual. The constitutional guarantee of due process of law requires that all coercive action of federal officials be authorized in law, and this authority cannot be stitched out of an individual's admission of certain facts that would, according to a treaty, entitle "competent national or local authorities" to take such action.

---

11. Petitioner claims that he was not told why he was being taken to INS headquarters, that the INS agents assured his wife that he would be back soon, and that he was not told the reason for his detention at the headquarters. In the evening of his first day of detention, ten hours after the initial confrontation, he was allowed to call his wife, informing her that he would not come home that night and that he was uncertain as to his future. The interview report filed by the INS investigator states: "SUBJECT'S wife has filed no application for her husband, and he has no lawyer."

The Naval Foreign Liaison Officer's interview report with Martinez-Angosto stated: "I emphasized to Martinez that he was entitled to legal council [sic] and that he should have his wife obtain a lawyer to advise him and represent him. He was advised that a lawyer appearing on his behalf would be allowed to visit him at any time." This interview took place three days after his initial arrest, after he was interrogated by the INS investigator and there is no way of determining at what stage of the interview with the naval officer Martinez-Angosto was so advised.

Competence to enforce that treaty must be conferred on the federal officials by law, and no such competence has been conferred on either the INS or Navy.

■ Appellee insists that there was "a rational basis" for the Spanish consul to seek the assistance of the Navy and for the Navy to oblige, since Martinez-Angosto came to the United States on an American naval vessel as part of the crew to man a destroyer that was to be turned over to Spain by the United States; and further, that "it was logical" for the INS investigators to imprison Martinez-Angosto, to notify the Navy, and to surrender him to the Navy once they had learned of his identity and status. The question is not, however, whether the conduct of the INS and Navy is understandable but whether it is lawful. The naturalness of the action does not compensate for the lack of authority. Appellee also insists that the agencies acted in accordance with their duty to uphold the laws of the United States, which, of course, includes it treaties. But since the Treaty only requires and permits "competent national or local authorities" to arrest and imprison deserters covered by the Treaty, it is difficult to see how either the Navy or INS personnel were obliged, not to mention authorized, because of their general duty to uphold the law of the United States, to take the action they did. The spectre of having every government official who takes an oath to uphold the laws of the United States competent, because of that oath, to arrest and imprison individuals claimed by Spanish authorities as deserters would indeed be alarming, to say the least.

Not surprisingly, the case law has been scant and unhelpful on the issue whether the Navy or the INS are "competent national or local authorities" to execute Article XXIV of the 1903 Treaty. We have been able to discover only two cases that deal with the deserting seamen provision of the Spanish treaty (see 49 Cong.Rec. 4566 (1913) (remarks of Senator Burton) commenting on the decline in actual practice of enforcing such provisions even by that time). In Medina-Fernandez v. Hartman, 260 F.2d 569 (9 Cir. 1958), the Spanish authorities employed the American Navy (with an assist from Mexican officials) to effectuate the return of the deserters; and in United States ex rel. Perez-Varella v. Esperdy, 285 F.2d 723 (2 Cir. 1960), cert. denied, 366 U.S. 925, 81 S.Ct. 1352, 6 L.Ed.2d 384 (1961), the Spanish authorities, in revealing the fundamental ambiguity in the phrase "competent national or local authorities," turned to the INS. Our case emerges as a hybrid. Neither Medina-Fernandez nor Perez-Varella explicitly dealt with the specific question we have confronted, and upon which we dispose of this case; and in Medina-Fernandez, where, as in our case, the Navy had custody of the deserters and assumed the ultimate power and responsibility for determining the applicability of the Treaty, the habeas writ was granted, though on a different ground.

Oddly enough, however, the issue that has given us pause, arose in different though analogous context, and in fact led to one of the first constitutional crises in our history as a nation. In 1794 the United States entered a Treaty of Amity, Commerce and Navigation with Great Britain, 8 Stat. 116, known as the Jay Treaty; and Article XXVII[12] of that

12. ARTICLE XXVII: "It is further agreed, that his Majesty and the United States, on mutual requisitions, by them respectively, or by their respective ministers or officers authorized to make the same, will deliver up to justice all persons, who, being charged with murder or forgery, committed within the jurisdiction of either, shall seek an asylum within any of the countries of the other, provided that this shall only be done on such evidence of criminality, as, according to the laws of the place, where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the offence had there been committed. The expence of such apprehension and delivery shall be borne and defrayed, by those who make the requisition and receive the fugitive."

Treaty, provided for the extradition of those charged with murder and forgery. The article obliged "the United States" to "deliver up to justice" all those so charged on condition that "this shall only be done" on sufficient "evidence of criminality." The article was silent, however, as to which officers of the United States had the power and responsibility to execute the Treaty, that is, to determine whether charges of murder or forgery were properly lodged against the individual sought and apprehended, and to assess the sufficiency of the evidence. This void in the Treaty was revealed when one Jonathan Robbins, alias Thomas Nash, was arrested and imprisoned in February, 1799, under a warrant of the District Judge for South Carolina, Judge Bee, "on suspicion of having been concerned in a mutiny on board" a British frigate in the high seas "which ended in the murder of the principal officers, and carrying the frigate into a Spanish port." Some six months later Judge Bee received a letter from the Secretary of State stating that the British consul had made an application to President Adams for the delivery of Robbins according to Article XXVII of the Treaty and concluding: "The president has, in consequence thereof, authorized me to communicate to you 'his advice and request,' that Thomas Nash may be delivered up to the consul or other agent of Great Britain who shall appear to receive him." Judge Bee brought on a habeas corpus proceeding, and after a hearing, ordered the marshal to surrender Robbins to the British consul. United States v. Robbins, 27 Fed.Cas. 825 No. 16175 (Dist.Ct.S.C. 1799).

In this way, the extradition provision of the Jay Treaty was executed, although, to a more glaring degree than that of the deserting seamen provision of the Treaty with Spain, this treaty failed to designate any officer to effectuate it, and no statute filled this void. Judge Bee's opinion gives the appearance that he, purportedly exercising an inherent power of the federal judiciary derived from Article III of the Constitution, as-

sumed the duty of executing the treaty, 27 Fed.Cas. at 833, and discharged this duty in a habeas corpus proceeding. It was generally thought, however, that this position was indefensible in the absence of a grant of jurisdiction by statute, or a treaty; and that Judge Bee's order, though not his opinion, could only be defended, if at all, if it were viewed as effectuating the "advice and request" of the President, which in turn was justified as an exercise of the executive power (Article II, section 1 of the Constitution) and a discharge of the President's obligation to "take Care that the Laws be faithfully executed" (Article II, section 3). See the statements of Mr. (later Chief Justice) John Marshall and Mr. Charles Pinckney, collected at 27 Fed. Cas. 833–837; but see In re Metzger, 17 Fed.Cas. 232, No. 9511 (Dist.Ct.S.D. N.Y.). It came to be understood that in the case of Jonathan Robbins it was the President who executed Article XXVII of the Jay Treaty, making the requisite determinations of law and fact. "That the Judge acted by order of the President, and in aid of the executive department, was never disputed; and the then administration was defended on the ground that the treaty was a compact between nations, and might be executed by the President throughout; and must be thus executed by him, until Congress vested the courts or judges with power to act in the matter; which had not been done in that instance," In re Kaine, 55 U.S. (14 How.) 103, 112, 14 L.Ed. 345 (1852). See also 4 Ops. Att'yGen. 201, 209–210 (1843); 13 Ops. Att'yGen. 354, 358–359 (1870); Ex parte Toscano, 208 F. 938, 942–943 (Dist.Ct. S.D.Cal. 1913); letter of July 1, 1799, from Judge Bee to the Secretary of State, 27 Fed.Cas. 842; and other materials collected in 27 Fed.Cas. 833–870 and 18 U.S. (5 Wheat.) 201 (Appendix), 5 L.Ed. 129 (1820).

The extradition of Jonathan Robbins was soon to become a cause célèbre, and it has been looked upon as authority for the proposition that the President, in virtue of his constitutional grant of exec-

utive power, is competent to execute a treaty, when, as in our case, the treaty fails to confer such competence on any particular officer, and Congress has not filled this void by an appropriate grant of authority. We do not believe, however, that this proposition could or should be used, or extended, to legitimate the Navy's or the INS's apprehension and detention of Martinez-Angosto for the purpose of executing the deserting seamen provision of the 1903 Treaty.

Although there is a considerable similarity between an extradition treaty-provision and a deserting seamen treaty-provision, and although the principle of the case of Jonathan Robbins has been extended by one district court (Ex parte Toscano, 208 F. 938 (Dist.Ct.Cal. 1913); but see Ex parte Orozco, 201 F. 106 (Dist. Ct.W.D.Tex. 1912)) to a treaty-provision [13] providing for the apprehension and internment of troops of belligerent armies escaping into the territory of a neutral, a treaty-provision which bears even a greater similarity to the deserting seamen treaty-provision, it is not entirely clear that the principle can be extended to a deserting seamen treaty-provision. The analogy between the extradition and deserting seamen treaty-provisions may well break down. Mr. Justice Woodbury, sitting on circuit, remarked by way of dictum in In re Sheazle, 21 Fed.Cas. 1214, 1217, No. 12734, (C.C.Mass. 1845): "A case, where an act of congress has been deemed necessary to aid the executive in enforcing treaties, is one passed 2 March, 1829, c. 41 (4 Stat. 359) [later to become Rev.Stat. § 5280], for imprisoning deserters from foreign vessels, drawn up by myself."

 Furthermore, unlike the case of Jonathan Robbins, and its progeny, neither the Navy nor the INS claim to have acted under the authority of a directive from the President ordering the arrest, detention and eventual return of Martinez-Angosto. Even if it could be maintained that the constitutional grant of executive power to the President empowers the President to execute Article XXIV of the 1903 Treaty, making him a "competent national authority" within the meaning of that article, it could not be maintained that this competence automatically devolves on the Navy or the INS.

There is no need for us to assess here the validity of the principle derived from the extradition of Jonathan Robbins and the execution of the Jay Treaty, for the President has not assumed the power and responsibility of executing the deserting seamen provision of the 1903 Treaty in the case of Martinez-Angosto, and it seems unlikely that he will. It may be, nevertheless, important to note that the Jonathan Robbins extradition caused great public concern at the time, and, aside from the fact John Marshall, not yet a Justice, came to the defense of President Adams, the validity of the principle derived from that case has not been finally determined. A controversy in part over this principle, raged outside the courts, and a resolution censuring President Adams for his role in this extradition was introduced into the House of Representatives. The resolution was defeated by a vote of 61 to 35 on March 7, 1800, but this did not quell the discontent, and this incident played a prominent role in the fall election, 27 Fed.Cas. 870, and had a considerable impact upon future treaties and legislation. The Act of 1829, establishing the enforcement machinery for deserting seamen treaty-provisions, could be viewed as a product of this evolving constitutional understanding, and in time it was reflected in extra-

13. Hague Convention of 1907 Respecting the Rights and Duties of Neutral Powers (ratified 1909), Chapter 2, Article 11: "A neutral Power which receives on its territory troops belonging to the belligerent armies shall intern them, as far as possible, at a distance from the theatre of war.

"It may keep them in camps and even confine them in fortresses or in places set apart for this purpose.

"It shall decide whether officers can be left at liberty on giving their parole not to leave the neutral territory without permission." 36 Stat. 2310, 2324.

dition treaty-provisions. The 1842 Treaty with Great Britain, see In re Sheazle, supra, and the 1843 treaty with France, see In re Metzger, supra, remedied the void of the Jay Treaty by specifically designating certain judicial officers as having the competence to execute the extradition provisions. And then Congress passed the Act of August 12, 1848, 9 Stat. 302, the source of Rev.Stat. § 5270 (1875), and later of 18 U.S.C. § 3184, presumably designed to reinforce, or to establish beyond peradventure, the authority of the designated judicial officers to execute the extradition provisions. "Public opinion had settled down to a firm resolve, long before the treaty of 1842 was made, that so dangerous an engine of oppression as secret proceedings before the executive, and the issuing of secret warrants of arrest, founded on them, and long imprisonments inflicted under such warrants, and then, an extradition without an unbiased hearing before an independent judiciary, were highly dangerous to liberty, and ought never to be allowed in this country," In re Kaine, supra, 14 How. p. 112, 14 L.Ed. 345. In sum, although we do not have to determine here whether the President would have the power to execute the 1903 Treaty, and to order the arrest and imprisonment of Martinez-Angosto, it would be wrong to uncritically assume that this power has been established beyond any doubt by the Jonathan Robbins incident.

In holding that neither the INS nor the Navy had the lawful authority to arrest and imprison Martinez-Angosto, even though they were seeking to enforce the 1903 Treaty, we have not been unmindful of the legitimate diplomatic and strategic interests served by the Treaty. However, these interests can only be satisfied within the limits of our constitutional scheme, which requires that all governmental action resulting in the deprivation of a person's liberty be authorized by law. See Ex parte Merryman, 17 Fed.Cas. 144, 147, No. 9487 (C.C.Maryland 1861) (Taney, C. J.); Ex parte Orozco, 201 F. 106 (Dist.Ct.W.D.Tex. 1912); cf. Reid v. Covert, 354 U.S. 1,

77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). Furthermore, for the following three reasons, we do not understand our holding to seriously compromise these interests.

First, it should be noted that the strategic interests at stake in this case are of no tremendous moment. The problem of preventing and deterring desertion is generally confided to the laws of Spain, to be enforced by Spanish authorities. We are merely dealing with the return of the deserter. Two strategic interests may be furthered by the return of a deserter: (a) the foreign laws designed to deter other desertions by punishing a known deserter can be applied only if a deserter is returned; and (b) the return may be needed in order to enable a ship of war, crippled by the desertion, to resume its operations. It is only this latter type of interest that urges the most summary, and, if need be, *ad hoc* procedures for the return of the naval deserter, see U. S. ex rel. Perez-Varella v. Esperdy, 285 F.2d 723, 725 (2 Cir. 1960), cert. denied, 366 U.S. 925, 81 S.Ct. 1352, 6 L.Ed.2d 384 (1961), and that type of interest is not present in our case. The arrest and imprisonment of Martinez-Angosto took place some three years after the Spanish ship of war had left the United States and, in such a situation the return of the deserter is not required with the same urgency as could possibly obtain if the ship were still in port. Compare the Immigration and Nationality Act, section 252(b), 8 U.S.C. 1282(b), 8 C.F.R. § 252.2, which provides for a summary procedure for the return of a seaman when the ship is still in port; after the ship has left port, a deserting seaman being expelled under the Act is entitled to the deportation procedure prescribed in section 242. We note the difference between these two situations, and refer to the dichotomy in the Immigration and Nationality Act's treatment of deserting seamen to illustrate that the distinction is intelligible, but we do not decide what conduct by American officials would be constitutionally permissible in the situation not before us.

Secondly, we have only dealt with the question whether the INS and Navy are competent authorities for executing the Treaty. Conceivably other government officials may be empowered under present law to determine whether the individual sought by the Spanish authorities must be returned under the terms of the Treaty, and to arrest and imprison the individual pending his return to Spain, cf. e. g., 18 U.S.C. §§ 3041, 3043, 3052, 3053; cf. In re Mineau, 45 F. 188, 189 (C.C.Vt.1891). We make no pretense of having reached that question. Moreover, nothing we have said is intended to suggest that Congress or perhaps even the President (see supra pp. 682–685,) cannot confer competence on certain officials to execute the Treaty, and in that sense fill the gap created by the repeal of Rev.Stat. § 5280. Only then might it become necessary to consider some of the propositions urged upon us by appellant, namely, that the ultimate determination as to the applicability of the Treaty must be entrusted to judicial rather than administrative officers, that an individual sought under the Treaty would be entitled to a full hearing, attendant with many of the constitutional safeguards present in criminal trials, and that the availability of habeas corpus proceedings does not constitutionally compensate for the inadequacies of a summary and *ad hoc* procedure implemented by administrative officers. The flaw we have perceived, the absence of any lawful authority on the part of the INS agents and investigators or the Navy to determine that the Treaty is applicable to Martinez-Angosto, and to arrest and imprison him for purposes of returning him to Spanish authorities, is far more elementary.

Thirdly, we see no reason why the diplomatic and strategic needs sought to be furthered by the Treaty could not be adequately satisfied by utilizing the procedures of the Immigration and Nationality Act of 1952 relating to alien crewmen, see generally subchapter II, part VI, sections 251–257, 8 U.S.C. §§ 1281–1287. We view these provisions of the Act as an alternative to the Treaty; the enactment of these provisions, and its precursors did not have the effect of "nullifying" the Treaty but neither did our continued adherence to the Treaty preclude Congress from legislating on naval deserters. In United States ex rel. Perez-Varella v. Esperdy, 285 F.2d 723 (2 Cir. 1960), cert. denied, 366 U.S. 925, 81 S.Ct. 1352, 6 L.Ed.2d 384 (1961), the court held that neither the Seamen's Act of 1915 nor the Immigration Acts of 1917 (39 Stat. 874), 1924 (43 Stat. 153) and 1952 "repealed" the 1903 Treaty as it applied to the crews of ships of war. With this we take no issue and we are in full accord. However, the court in *Perez-Varella* also stated (285 F.2d at 725), in what could perhaps be technically classified as a dictum, that although the Immigration Act of 1917 covered "any alien seamen" it was not "applicable to sailors on foreign ships of war." One could infer that the *Perez-Varella* court was of the opinion that, although the 1952 Act covers alien crewmen, it would not be "applicable to sailors on foreign ships of war." With this we would take sharp issue.

The statutory definition of "crewman," section 101(a) (10), 8 U.S.C. § 1101(a) (10), as "a person serving in any capacity on board a vessel or aircraft," is not limited in any way so as to exclude sailors on foreign ships of war. See also the definition of "alien crewman," section 101(a) (15) (D), 8 U.S.C. § 1101(a) (15) (D); and see 22 C.F.R. §§ 41.36, 41.62, for the documentation provisions of the Act being applied to military crewmen. The Immigration and Nationality Act of 1952 was thought of as a comprehensive legislative scheme and there is no manifest reason why this narrow class of aliens should have been excluded. Of course, a desertion from a ship of war may pose a graver threat to the national interest of the state to which the ship belongs than would a desertion from a merchant ship. But there is no reason to believe that these strategic interests could not be accommodated within the Act. See supra p. 685. These strategic interests could also be safeguarded by

having a treaty supplement the immigration laws and thus provide an alternative means of dealing with the naval deserters. To be sure, these strategic interests are furthered rather than jeopardized, by having the Act apply to alien crewmen, without distinction to whether the vessel or aircraft was in the military service of the foreign state. In the absence of such coverage under the Act, and without a treaty between the United States and the foreign state there would be no means of having the deserters arrested and detained for return. Tucker v. Alexandroff, 183 U.S. 424, 22 S.Ct. 195, 46 L.Ed. 264 (1902). The 1903 Treaty between Spain and the United States does not cover deserters from Spanish military aircraft, and it is difficult to believe that "an alien crewman" includes crews on merchant vessels and crews on both military and merchant aircraft but excludes crews on military vessels. Hence, for Spain alone, an interpretation of the Act which excluded military crews, would leave Spanish and American authorities without any means of returning deserters from Spanish military aircraft. The consequences of such an interpretation for other nations of the world community would be far more critical. Out of the more than a hundred nations in the world, only Greece and Spain have a treaty covering naval deserters with the United States. It would be difficult to believe that naval deserters from Spanish and Greek ships are not covered by the Act while naval deserters of all the other nations are covered; and it would be calamitous, both for the foreign country and our immigration policy if all deserters from military vessels and aircraft belonging to all countries without a special treaty with the United States, were beyond the reach of the Immigration and Nationality Act.

In suggesting that the domestic immigration laws do not apply to naval deserters, the *Perez-Varella* court apparently invoked the Seamen's Act of 1915 and principles of international law relating to the immunity of foreign troops to local jurisdiction. Neither ground is persuasive.

The Seamen's Act of 1915 sought the termination of deserting seamen treaties only insofar as they applied to merchant seamen. It does not follow from this, however, that an exemption must be carved out of the statutory category of crewmen for naval crewmen. It is possible that the 1903 Treaty and the national immigration laws are alternative procedures to attain the same end, especially since the treaty-alternative is unavailable for desertions from the military vessels of most nations and desertions from military aircraft of all nations.

■ There is a passage in the *Perez-Varella* opinion where principles of international law are invoked and the "situation of a seaman on a ship of war in a foreign port" is analogized "to that of a soldier in troops that have been given leave to pass through the territory of another friendly state." The court premised that under principles of international law the soldier remains "subject to the same controls that apply while the regiment is in its own territory" and that he is immune from the local jurisdiction, and concluded, seeking support from a statement of Chief Justice Marshall in the Exchange, 11 U.S. (7 Cranch) 116, 143, 3 L.Ed. 287 (1812), that the same would be true of a seaman on a ship of war. The significance the court attaches to this supposed immunity is not free from doubt; but the development of this point could perhaps be viewed as support for the position that a naval deserter is not covered by—or is immune from—the domestic immigration laws. It does not, however, furnish the requisite support. Without attempting to assess the validity of the general proposition that a foreign troop passing through the territory of another nation, or a crew on a ship of war in a foreign port, is immune from local jurisdiction, see Restatement, Foreign Relations Law of the United States, §§ 54–63, it is clear from Tucker v. Alexandroff, supra, 183 U.S. at 433–434, 458–459, 22 S.Ct. 195, that this proposition has no applicability to the situation be-

fore us, where the sailor has deserted from the ship of war, has become economically and socially integrated within a local community, and has done all this three years prior to his apprehension. Cf. also the last paragraph of the 1903 Treaty quoted in footnote 2. The question is whether this deserter can be deported under the domestic immigration laws, and it is difficult to see how an affirmative answer to this question could seriously interfere with the internal discipline of the long departed Spanish ship of war. No principle of international law precludes American immigration laws, including the Immigration and Nationality Act of 1952, from being applied to a deserter from a foreign ship of war under the conditions present in this case, and any suggestion in *Perez-Varella* to the contrary appears to be based on views of international law that are in sharp conflict with those expressed by the Supreme Court in *Tucker v. Alexandroff*.

It seems therefore that the Immigration and Nationality Act of 1952 contains an established and orderly procedure for dealing with naval deserters, that Congress and perhaps the President could easily establish a domestic enforcement machinery for the 1903 Treaty, but that, under the presently existing law, neither the INS nor the Navy has the legal competence to determine whether Martinez-Angosto, or any other alleged naval deserter, must be returned to Spanish authorities under the terms of the 1903 Treaty, or to arrest and imprison him for that purpose. The Navy's detention of Martinez-Angosto is unlawful and the petition for the writ of habeas corpus be granted and relator set at liberty, unless within a reasonable time the INS institutes appropriate deportation proceedings under the Immigration and Nationality Act of 1952, or some agency demonstrating to the District Court that it has competence to execute Article XXIV of the 1903 Treaty with Spain takes over the conduct of relator's case.

Reversed.

FRIENDLY, Circuit Judge (concurring):

As I read my brother Marshall's learned and comprehensive opinion, we decide only that Article XXIV of the Treaty of Friendship and General Relations with Spain, 33 Stat. 2117, cannot be enforced against a Spanish naval deserter in the absence of lawful designation of "the competent national or local authorities." Whether or not, by virtue of his position as "the sole organ of the nation in its external relations, and its sole representative with foreign nations" (John Marshall's statement of March 7, 1800, Annals 6th Cong., vol. 613) and his constitutional duty to "take Care that the Laws be faithfully executed," Art. II, § 3, the President would have inherent power to designate "the competent national or local authorities," cf. McNair, The Law of Treaties 80 (1961), it is a fair inference that when Congress repealed Rev.Stat. § 5280, it understood he would have power to make that designation to the limited extent that the treaties with respect to the return of deserters were to remain effective. Cf. Cook v. United States, 288 U.S. 102, 118–119, 53 S.Ct. 305, 77 L.Ed. 641 (1913). If the point on which we decide had been squarely raised in relator's petition to the district court, action might well have been taken by the chief executive to fill what we now find to be a procedural void that prevents the United States from discharging its obligations to Spain. Thus our order of reversal will allow the District Court to postpone relator's release for a reasonable time to permit a suitable executive order to be issued if the President be so advised, as well as the alternative of an appropriate deportation proceeding under the Immigration and Nationality Act of 1952. Cf. In re Medley, Petitioner, 134 U.S. 160, 173–175, 10 S.Ct. 384, 33 L.Ed. 835 (1890). On that basis I concur in the judgment.